227 N.J. Super. 214 (1988)
546 A.2d 563
RIEDER COMMUNITIES, INC., D/B/A DAYTON SQUARE, DAYTON CENTER AND DAYTON CENTER EAST; SILVER BAY PROPERTIES, INC.; RIDER LAND TECHNOLOGY, INC.; SOLOMON RIEDER, GEORGE RIEDER AND STANLEY RIEDER, PLAINTIFFS-APPELLANTS,
v.
TOWNSHIP OF NORTH BRUNSWICK, DEFENDANT-RESPONDENT.
CHARLES J. KUPPER, INC., DEFENDANT-THIRD-PARTY PLAINTIFF-RESPONDENT, AND INTERNATIONAL BUSINESS MACHINES CORPORATION, MIDEAST ALUMINUM INDUSTRIES, INC., R & M, INC. AND OTHER UNKNOWN COMPANIES AND INDIVIDUALS, DEFENDANTS,
v.
TOWNSHIP OF SOUTH BRUNSWICK, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued May 24, 1988.
Decided August 9, 1988.
*216 Before Judges MICHELS, GAYNOR and ARNOLD M. STEIN.
Herbert C. Klein, argued the cause for appellants (Klein, Chapman, Greenburg, Henkoff & Siegel, attorneys; Michael A. Saffer, on the brief; Herbert C. Klein, of counsel).
*217 Thomas J. Savage, argued the cause for respondent Township of North Brunswick (Savage & Serio, P.A., attorneys; Dawn A. Serio, on the brief; Thomas J. Savage, of counsel and on the brief).
Robert S. Susser, argued the cause for respondent Charles J. Kupper, Inc. (Karasic, Stone & Susser, attorneys; Russell J. Malta, on the brief; Robert S. Susser, of counsel and on the brief).
The opinion of the court was delivered by GAYNOR, J.A.D.
Plaintiffs, land developers and builders in South Brunswick Township, collectively referred to as Rieder, appeal from the dismissal of their complaint seeking damages because of building delays allegedly caused by, (1) the negligence of defendant, Charles J. Kupper, Inc. (Kupper) in the performance of its duties as the design engineer for the construction of a North Brunswick Township sewer extension and thereafter as the consulting engineer, and (2) the failure of North Brunswick to comply with a contract between it and South Brunswick providing for the pumping of a certain volume of sanitary sewage from South Brunswick through the North Brunswick facilities to the treatment plant operated by the Middlesex County Sewerage Authority. The contract claim was dismissed on North Brunswick's motion for summary judgment and the claim against Kupper was dismissed following an extended bench trial.[1]
On this appeal, plaintiffs contend that the summary dismissal of their claim against North Brunswick was contrary to law and, as the authority relied upon by the motion judge was *218 subsequently reversed by the Supreme Court, a reversal of the summary judgment in favor of North Brunswick is required. Further, it is urged that the decision of the trial court dismissing the claim against Kupper cannot stand as (1) findings of the court were contrary to the evidence, (2) in limiting its findings concerning the asserted negligence of the engineer to the subject of the design contract, the court misconceived the essence of the negligence charged against Kupper, (3) the court erroneously limited, as a matter of law, the scope of Kupper's duty toward North Brunswick, (4) Kupper was liable in tort to plaintiffs despite the absence of privity, and (5) the court's collateral attack on plaintiffs' receipt of building approvals from South Brunswick constituted an excursion into an issue irrelevant to a disposition of the action. We disagree and affirm.
In May 1969, Kupper was retained by North Brunswick to design and monitor the construction of an extension of its main sewer trunk line known as the Maple Meade extension. Kupper prepared a report and recommended that neighboring tributary municipalities be contacted to determine whether they were interested in participating in this project. This suggestion was followed and South Brunswick expressed interest in the proposal. By a further agreement entered into in 1970, Kupper was retained to evaluate the capacity of the North Brunswick sewerage facilities to determine whether South Brunswick's estimated flows could be accommodated. Further reports prepared by Kupper analyzing the effect of South Brunswick's use of the North Brunswick sewer system served as a basis for the contract subsequently entered into by the two municipalities. It was conceded that these reports contained representations that the existing North Brunswick system had the capacity to accept three million gallons per day (MGD) peak flow from South Brunswick.
The contract between the townships was executed on August 10, 1971. In pertinent part, it provided that South Brunswick would convey its sewage through the North Brunswick system *219 for treatment at the Middlesex County Sewerage Authority's treatment plant; that a sewer line known as the Georges Road line would be constructed by South Brunswick and connected to the North Brunswick Maple Meade extension; and that South Brunswick would pay the cost of the required oversizing of the Maple Meade extension. In return, South Brunswick was granted the right to transmit up to three million gallons a day peak flow through the North Brunswick sewer system. It was agreed that any upgrading costs necessitated by the flow from South Brunswick would be shared by the two municipalities. However, South Brunswick would have no obligation to contribute to upgrading costs until it had transmitted in excess of 3.0 MGD peak flow or the expiration of five years. The agreement also provided for the periodic review by North Brunswick's consulting engineer of the major components of the North Brunswick system to determine capacity and condition. The contract was effectuated upon the completion of the Maple Meade extension construction in September 1971.
During 1971, plaintiffs were contemplating the purchase of large tracts of undeveloped land in the Dayton area of South Brunswick. Upon assurance by the Director of Public Works that, because of the contract with North Brunswick and the adoption of a sewer construction ordinance, South Brunswick would have adequate sewer capacity for the proposed developments, plaintiffs proceeded with the acquisition of land for a large housing development. As the development was to be built in phases, a portion of the land was acquired by way of option contracts which allowed plaintiffs to close title when development was imminent.
By July 1975, the Georges Road line had been constructed by South Brunswick and connected to the North Brunswick sewer system. Construction costs approximated $4 million which were raised through a sewer assessment against landowners, including plaintiffs, whose properties were benefitted by the improvement. During the summer of 1975, when South Brunswick was sending about 0.8 MGD peak flow through the North *220 Brunswick system, the system began experiencing overflows. However, South Brunswick was not informed of any overflow problem by North Brunswick or Kupper until 1977, although it had previously received some information in this regard from its own employees. During 1977, Kupper issued three reports relating to the capacity of the North Brunswick sewer system. The February report considered the effect of two high density developments in North Brunswick on the Livingston Avenue interception system and concluded that the system could accommodate the estimated .35 MGD to be thereby generated with the implementation of certain improvements. The subsequent reports in September and October concluded that there were problems throughout the system and that the cost of resolving these problems would far exceed the amount that the township ever expected to spend.
During the previous September, upon obtaining construction approval from the South Brunswick Planning Board for a portion of the proposed housing development, plaintiffs made inquiry concerning the issuance of the necessary sewer permits. Although South Brunswick was prepared to approve the application, North Brunswick's approval was also required since the sewage would flow through its system. Because of the overflows then being experienced, plaintiffs were informed that such approval would not be forthcoming. In May 1977, South Brunswick was formally notified that North Brunswick would not be endorsing any new applications for sewer connection permits submitted by South Brunswick residents. It was indicated that overloading problems at the Edly's Lane pumping station made this action necessary. Plaintiffs' formal application in September 1977 for sewer permits, although endorsed by South Brunswick, was rejected by North Brunswick and consequently by the New Jersey Department of Environmental Protection. This rejection prompted plaintiffs to devise a plan for the routing of the sewage in another direction for treatment at the Stony Brook Regional Sewerage Authority's plant in Monmouth Junction. This plan was approved by South Brunswick *221 enabling plaintiff to receive final approval for its development in November 1979. Not being able to sewer their projects through North Brunswick, as originally planned, allegedly caused plaintiffs to incur the losses for which recovery was sought in the present action.

I.
In challenging the summary disposition of its claim against North Brunswick based upon alleged third-party beneficiary rights under the 1971 contract between North and South Brunswick, plaintiffs contend the motion judge failed to recognize the existence of factual issues precluding the grant of summary judgment. Assertedly, as the determinative factor concerning third-party beneficiary rights is the intention of the contracting parties, an evidential hearing was required. Moreover, it is urged the recital in the contract that "all parties hereto are interested in promulgating orderly development and expansion of sanitary sewerage facilities within the drainage areas served (sic) the parties," supports plaintiffs' contention that they were intended beneficiaries of the contract. Also, their having been assessed for the expansion of South Brunswick's sewer facilities in furtherance of the contract allegedly demonstrates that plaintiffs were more than merely incidental beneficiaries of the agreement between the two townships. Plaintiffs further argue that public policy considerations require that they be permitted to enforce North Brunswick's obligations under the contract. Additionally, it is contended that a reversal of the summary judgment granted North Brunswick is required because of the motion judge's reliance upon Reimann v. Monmouth Consol. Water Co., 9 N.J. 134 (1952) and the subsequent overruling of that case by the Supreme Court's decision in Weinberg v. Dinger, 106 N.J. 469 (1987).
N.J.S.A. 2A:15-2 provides that a person for whose benefit a contract is made may sue on the contract in any court. This statute merely restates established New Jersey law that third-party *222 beneficiaries may sue upon a contract made for their benefit without privity of contract. Houdaille Constr. Materials, Inc. v. American Tel. & Tel. Co., 166 N.J. Super. 172, 184-185 (Law Div. 1979). The standard applied by courts in determining third-party beneficiary status is "whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts...." Brooklawn v. Brooklawn Housing Corp., 124 N.J.L. 73, 77 (E. & A. 1940). See also Broadway Maintenance Corp. v. Rutgers, 90 N.J. 253, 259 (1982). Unless such a conclusion can be derived, a third party has no cause of action despite the fact that it may derive an incidental benefit from the contract's performance. Gold Mills, Inc. v. Orbit Processing Corp., 121 N.J. Super. 370, 373 (Law Div. 1972).
As stated in Gold Mills:
The essence of contract liability to a third party is that the contract be made for the benefit of said third party within the intent and contemplation of the contracting parties. Unless such a conclusion can be derived from the contract or surrounding facts, a third party has no right of action under that contract despite the fact that he may derive an incidental benefit from its performance. Crown Fabrics Corp. v. Northern Assur. Co., Ltd., 124 N.J.L. 27 (E. & A. 1939); Brooklawn v. Brooklawn Housing Corp., 124 N.J.L. 73 (E. & A. 1939) and Moorestown Management, Inc. v. Moorestown Bookshop, Inc., 104 N.J. Super. 250 (Ch.Div. 1969). Under such circumstances, he is neither a creditor beneficiary nor a donee beneficiary but is merely an incidental beneficiary who acquires no enforceable rights under the contract. [121 N.J. Super. at 373]
Thus, the intention of contracting parties to benefit an unnamed third party must be garnered from an examination of the contract and a consideration of the circumstances attendant to its execution. Here, the contract between the municipalities was entered into in 1971  long before plaintiffs had become a property owner in South Brunswick. While the contractual arrangement permitted South Brunswick to expand municipal sanitary sewer facilities, it was designed to provide a regional approach to the handling of sewerage. The benefitting property owners in South Brunswick were merely incidental beneficiaries of that arrangement. We discern nothing in the agreement nor in the surrounding circumstances to indicate that such *223 South Brunswick property owners were intended to have the right to enforce the obligations of the contract or to sue for damages allegedly arising from a breach of the contract.
Furthermore, in our view, policy considerations militate against the incorporation of third-party beneficiary rights in an inter-municipal agreement providing for the regionalization of a governmental service. Subjecting the cooperating municipalities to the claims of benefitting property owners for any damage resulting from a failure of full compliance with the agreement would have a chilling effect upon the willingness to pursue advantageous regional solutions to sewerage waste disposal problems.
Moreover, we do not perceive that Reimann or the overruling decision in Weinberg is applicable to this third-party beneficiary claim advanced by plaintiffs. In Weinberg it was noted that in dealing with a direct contract for water service between consumer and water company, "the majority-rule jurisdictions generally construe it strictly and deny liability unless the contract expressly provides that the water company furnish water to fire hydrants servicing the customer's property." Weinberg, 106 N.J. at 479 (citations omitted). However, the decision in Weinberg is not relevant to the present case as it was based upon tort, rather than contract, principles. 106 N.J. at 480-483.

II.
Contrary to plaintiffs' contention, the trial judge's factual finding that the North Brunswick sewerage system could accommodate an average peak flow of 3.0 MGD of sewage from South Brunswick, as required by the contract, was supported by adequate, credible evidence present in the record. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974). "Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Id. Mindful that our fact finding power should be *224 invoked sparingly and only in a "clear case where there is no doubt about the matter," Van Allen v. Bd. of Comm'rs of Tp. of Bass River, 211 N.J. Super. 407, 411 (App.Div. 1986), we discern no basis for disturbing the finding of the trial court in this regard.
Expert testimony produced by Kupper demonstrated that the average peak flow of the sewage flow from South Brunswick into the North Brunswick system exceeded 3.0 MGD during 1977, 1978 and 1979. Plaintiffs' expert testified that the flow was less than 3.0 MGD during these years. Both experts also differed as to the capacity of the Lawrence Brook pumping station, with plaintiffs' expert indicating the capacity of one of the pumps being less than 3 MGD, while Kupper's expert testified that each of the two pumps had a capacity of 3 MGD and that in the latter part of 1977 there was continuous pumping. That the testimony of Kupper's expert was found to be the more persuasive reflects the judgment of the trial court in its assessment of the credibility of the witnesses, a matter which is peculiarly within the province of the fact finder. See State v. Ingenito, 87 N.J. 204, 212 (1981). Since matters of credibility are within the domain of the fact finder rather than a reviewing court, we may not fairly interfere with such determinations made by a trial judge in evaluating the weight of the evidence in a bench trial. See State v. Butler, 32 N.J. 166, 196 (1960), cert. den. 362 U.S. 984, 80 S.Ct. 1074, 4 L.Ed.2d 1019 (1960).

III.
In contending that the trial judge misconceived the various allegations of negligence asserted against Kupper, plaintiffs assert the court failed to address the evidence which allegedly demonstrated acts of negligence during the period 1971-1977. Particularly, it is claimed that the evidence disclosed negligence in Kupper's failure to recommend studies pertaining to the inflow and infiltration problems affecting the *225 Maple Meade system and in its conclusion in 1977 that the system could accommodate additional connections in North Brunswick. Assertedly, such conduct adversely impacted upon North Brunswick's contractual obligation to accept 3.0 MGD peak flow of sewage from South Brunswick. However, this contention is undercut by the evidentially supported finding that the North Brunswick system was capable of accepting the agreed upon sewage flow from South Brunswick. In directing his attention to that factual dispute, the trial judge focused upon the controlling issue in the case.
Moreover, it is noted the trial judge did not ignore the evidence of overflows in the North Brunswick system. Rather, the evidentiary value of such proofs was considered. In this regard, the judge observed:
It is the opinion of this Court that those problems have little  would have little evidential value in determining the issues here. Both Airport Road and Remsen Avenue are well north of the Maple Meade Extension. Their distance greatly diminishes their importance in handling the South Brunswick flow. It is clear from the evidence presented that the difficulties primarily arose at the Edly's Lane Pumping Station which is immediately north of the Maple Meade Extension. And as to that pumping station, the question remains as to its capacity.
We also note the absence of any definitive evidence that the overflows were due to lack of capacity. The documentary proof addressing this issue attributed the overflow to various factors, several of which were maintenance problems.
Any failure of the trial judge to have more specifically addressed these added allegations of negligence on the part of Kupper was harmless error.

IV.
Reversible error is also claimed to have been committed by the trial judge in considering that Kupper's conduct as an independent contractor was circumscribed by the retainer agreements entered into with North Brunswick in 1969 and 1970. Assertedly the trial judge thereby erred in not considering Kupper's alleged duty to recommend to North Brunswick *226 that studies be conducted toward remedying the inflow and infiltration problems which had been identified in the system. Presumably, if such recommendations had been made, North Brunswick would have remedied the problem, thereby enabling it to comply with the requirements of the South Brunswick contract. Again, we note that this argument lacks substance in view of the determination that the North Brunswick system had the capacity to accept 3.0 MGD peak flow of sewage from South Brunswick in accordance with the contract.
In any event, while arguably Kupper might have been under a duty to North Brunswick to have recommended that a study of the inflow-infiltration problems in the system be conducted, we do not perceive any such duty owing to plaintiffs. To ground liability in negligence it is not enough to show that a defendant did not act with reasonable care. It must also be shown that the defendant owed plaintiff a duty of care. Weinberg v. Dinger, 106 N.J. at 484-485. Duty arises out of a relation between "particular parties that in right reason and essential justice enjoins the protection of the one by the other against what the law by common consent deems an unreasonable risk of harm, such as is reasonably foreseeable." Wytupeck v. Camden, 25 N.J. 450, 461 (1957). We discern no such relationship existing between Kupper and Rieder. Moreover, the risk reasonably to be perceived defines the duty to be obeyed. Hill v. Yaskin, 75 N.J. 139, 144 (1977). We are satisfied that an objective viewing of the attendant facts, including the uncertainty as to the successful implementation of a recommended course of action directed toward overflow conditions in a sewerage system, would not lead a consulting engineer to reasonably foresee that the failure to make the claimed recommendations would create the risk of injury asserted by plaintiffs. To place such a burden upon Kupper in this case would unreasonably subject it to liability for unforeseeable and indeterminable risks. See Griesenbeck by Kuttner v. Walker, 199 N.J. Super. 132, 139 (App.Div. 1985), certif. den. 101 N.J. 264 (1985). Plaintiffs' contention thus substantively lacks merit.
*227 Plaintiffs' reliance on Evers v. Dollinger, 95 N.J. 399 (1984) is misplaced as that case is factually and legally distinguishable from the present case.

V.
Plaintiffs further contend that Kupper's failure to advise South Brunswick of the many problems in the North Brunswick sewerage system affecting the capacity of the Maple Meade extension constituted negligent misrepresentation which was causally related to plaintiffs' delayed development of the Dayton projects. Assertedly, Kupper's silence toward South Brunswick from 1973 through 1977 concerning problems with the North Brunswick system proximately caused the 1977 sewer moratorium which precluded plaintiffs from developing their properties in a timely fashion. It is urged that the lack of privity is no bar to Kupper's liability under traditional notions of negligence principles, citing Gold Mills, Inc. v. Orbit Processing Corp., 121 N.J. Super. 370 (Law Div. 1972), and the doctrine of negligent misrepresentation enunciated in Rosenblum v. Adler, 93 N.J. 324 (1983).
We have previously considered and rejected Kupper's asserted liability to plaintiffs on the grounds of negligence because of the absence of duty and a breach thereof. The claim based upon negligent misrepresentation must also fail in view of the supported finding by the trial court that the North Brunswick system was capable of accepting 3.0 MGD peak flow of sewage from South Brunswick. An essential element of the cause of action  a negligent misrepresentation  thus was not present. Accordingly, we need not consider whether under the attendant circumstances plaintiffs were foreseeable users of the information which Kupper allegedly withheld from South Brunswick or whether the public interest would be served by imposing liability upon Kupper for such failure to act. See Rosenblum v. Adler, 93 N.J. at 341-342.

*228 VI.
While objecting to the trial court's finding that plaintiffs were not able to commence construction of their projects until November 1978 when complete ownership of the lands had been acquired, plaintiffs do not argue the "merits or demerits of the trial court's decision on this issue." However, it is submitted that such finding was entirely irrelevant to a disposition of the action. In this posture of the contention, we perceive no reason for our consideration of the matter. However, it would appear that the finding had relevancy to the measure of damages, an issue which was not reached by the court.
For the reasons stated, the order entered February 15, 1985 granting summary judgment to North Brunswick and the order of judgment entered July 1, 1986 dismissing plaintiffs' cause of action against Kupper are affirmed.
NOTES
[1] As to the other named defendants: Mideast Aluminum Corporation was granted summary judgment by order dated March 27, 1984; and International Business Machines Corporation and plaintiffs settled the controversy as between them on November 25, 1985. The third-party complaint was also settled prior to trial.