**SYNOVUS BANK OF TAMPA BAY, Plaintiff,**

v.

**VALLEY NATIONAL BANK, et al., Defendants.**

No. 05 Civ. 3561(PKC).

United States District Court, S.D. New York.

Feb. 7, 2007.

Tim A. O'Brien, Morrison & Foerster LLP, McLean, VA, for Plaintiff.

Gregory R. Haworth, William J. Votta, Duane Morris, LLP, Newark, NJ, for Defendants.

*MEMORANDUM AND ORDER*

CASTEL, District Judge.

This is a dispute between two commercial banks arising out of the relationship of each with the now defunct air carrier, Southeast Airlines, Inc. ("Southeast"). Plaintiff, formerly known as United Bank and Trust Company ("United") and now known as Synovus Bank of Tampa Bay, maintained a MasterCard and Visa merchant account for Southeast and suffered losses when payments for cancelled flights were refunded by United to would-be pas-

sengers.[1] Defendants Valley National Bank and Valley National Bancorp ("Valley") maintained depository accounts for Southeast, pursuant to regulations of the United States Department of Transportation ("DOT"), which require that financial security arrangements remain in place until the flight is completed. United claims rights in the sums in the depository accounts and asserts that Southeast did not maintain the required deposits in the Valley account and that Valley is liable for Southeast's failure to do so.

United has asserted claims against Valley under DOT regulations and asserts common law claims for breach of contract, breach of fiduciary duty and for an accounting. Valley disputes that any private right of action exists under the DOT regulations in favor of a merchant bank and, further, vehemently denies that it owes United any duty, contractual or otherwise.

The Valley defendants now move for summary judgment dismissing all claims. For the reasons set forth below, Valley's motion is granted as to all claims other than United's third-party beneficiary claim under an Irrevocable Letter of Instructions executed by Valley and Southeast. United's motion for partial summary judgment as to the funds held in the depository accounts is denied without prejudice and motion to amend to assert a claim for punitive damages is denied. As to the surviving third-party beneficiary claim, pursuant to Rule 56(d), Fed.R.Civ.P., I conclude that United may not recover against Valley any sums in excess of the balance in the depository accounts, except that I do not reach the issue of whether United, if it prevails as to any portion of the sums on deposit, would be entitled to prejudgment interest thereon.

*The Undisputed Facts and the DOT Regulatory Scheme*

I will first address Valley's motion for summary judgment and, for those purposes, I accept those facts that that the non-movant, United, does not dispute. On Valley's motion, where there is a dispute on a material fact, I accept United's version of the facts. All reasonable inferences are drawn in favor of United as the non-movant.

Despite the failure to agree upon a joint statement of facts, there does not appear to be much dispute as to the underlying facts. Pursuant to Local Rule 56.1, the movant, Valley, submitted a statement of the material facts that it considers to be not in dispute, citing to the record support for same. The response of United does not take issue with most of the key facts.

Southeast, based in Largo, Florida, was a "direct air carrier" because it was a "certificated" air carrier directly engaging in "the operation of aircraft under a certificate, permit or exemption issued by the [DOT]." 14 C.F.R. § 212.2. The DOT regulations contain certain payment protection regulations requiring direct air carriers to make escrow or bonding arrangements to ensure that customers receive refunds in the event of a cancelled flight. The DOT regulations prohibited a "certificated" air carrier from performing any charter trip "unless there is on file with the [DOT] a copy of a currently effective agreement made between said carrier and a designated bank, by the terms of which all sums payable in advance to the carrier by charterers, in connection with any such trip to be performed by said carrier, shall be deposited with and maintained by the bank, as escrow holder...." *Id.* § 212.8. The regulations further mandate that certain

---

1. By stipulation and order of January 12, 2007, "Synovus Bank of Tampa Bay" has been substituted for United Bank and Trust Company.

conditions be placed in the agreement with the bank.[2]

Southeast was also a "Public Charter operator" within the meaning of DOT regulations. *Id.* § 380.2. A "Public Charter operator" must enter into a type of "security agreement" providing for a surety bond, surety trust agreement or standby letter of credit in specified amounts. *Id.* § 380.34(a), (c)(1)-(2). If the operator opts for a certain type of security agreement, then it must also have an agreement with a designated bank providing that payments received from passengers be held by the bank until the air carrier certifies in writing that the flight has been completed. *Id.* §§ 212.8(a), 380.34(b). The regulations mandate that certain terms be included in the agreement between the operator-carrier and the depository bank. *Id.*

As of September 2000, Southeast maintained depository accounts, as contemplated by the DOT regulations, at Atlantic Bank ("Atlantic"). Valley Bank opened an escrow unit sometime in the fall of 2000 and began exploring the acquisition of the escrow services department of Atlantic. On December 19, 2000, Atlantic transferred all of the funds in the Southeast accounts to Valley. From in or around December 2000 through to the time Southeast ceased operations, Valley served as Southeast's depository bank.

Valley entered into to two separate agreements with Southeast: a "Direct Air Carrier Charter Trip Depository Agreement" dated November 15, 2000 ("Direct Air Agreement") and a "Public Charter Depository Agreement" dated January 1, 2001 ("Public Charter Agreement"). The Direct Air Agreement provides that the "Bank shall not bear any responsibility for determining that Carrier has: (i) deposited with Bank all or any sums received by Carrier in connection with a charter trip; or (ii) fulfilled its obligations under Part 212, the Charter Contract or this Depository Agreement. The duties of Bank are only as specifically provided herein and are purely ministerial in nature." (¶ 11(a)) The Public Charter Agreement similarly describes Valley's role as "purely ministerial in nature" and provides that "Bank shall be under no obligation and bear no responsibility in respect of any of the items deposited with it other than to faithfully follow the terms of this Agreement." (¶¶ 4.1, 4.2)

The Direct Air Agreement provides that "nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Depository Agreement." (¶ 27) The Public Charter Agreement contains nearly identical language. (¶ 7.12)

Prior to Southeast's depository agreements with Valley, United had provided banking services relating to Southeast's MasterCard and Visa sales. The parties refer to United's role as that of "merchant bank" and it appears that United acquired the credit card debt from Southeast in exchange for payment. United executed a "Financial . Institution MasterCard/Visa Merchant Agreement" with Southeast on or about September 13, 2000 (the "Merchant Agreement"). The Merchant Agreement required United to "extend financial accommodations to Merchant [*i.e.* Southeast] and arrange for payments to Merchant for the amounts of such Card related sale ... transactions ...," subject to cer-

---

**2.** The regulation does permit the filing of a certain type of surety bond in lieu of the agreement with the bank. *Id.* § 212.8(c).

tain specified conditions. (Merchant Agreement Preamble)

The MasterCard or Visa "regulations" required United to refund to passengers who paid via Visa or MasterCard for flights that were cancelled. United "deactivated" the Southeast account in around March 2001 because the carrier was not operating flights and the account with United was reactivated sometime after November 2001.

The Merchant Agreement gave United sweeping rights to inspect the books and records of Southeast, "including without limitation Merchant's [i.e. Southeast's] books and records concerning all Sales Drafts previously presented to Financial Institution for credit." (¶ 5.D)

On February 6, 2002, Southeast and Valley executed a one-page document titled an "Irrevocable Letter of Instructions" (the "Instructions"). The Instructions were drafted by a former flight attendant with a degree in accounting who was employed by Southeast. It recites that "[t]his letter serves as instruction by Southeast ... to authorize the release of passenger funds at the request of United Bank ... under the following conditions." The conditions are stated as follows:

1. Said passengers' funds were escrowed for flights arranged by Southeast ..., cancellation of specific flights will be certified by Southeast.... In the event that cancelled flights can't be certified by Southeast ..., any monies owed due to cancellation will be returned to United Bank.

2. Said passengers' funds were transferred utilizing merchant services provided by United Bank ..., and its corresponding bank, Independent Banker's Bank.

3. Requested funds to Bob Halagarda [of Valley] by United Bank ... only if necessary to cover credit card request for cancelled flights.

United is not a party to the Instructions which were executed jointly by Southeast and Valley. United insisted upon the Instructions as a condition to reactivating Southeast's account.

As a result of the demise of Southeast, United has refunded $9,059,280.24 to passengers who paid for cancelled flights utilizing MasterCard or Visa. The Complaint alleges that on or about December 7, 2004, shortly after Southeast ceased operating, Valley informed United that it was holding $636,159.00 in the depository accounts. (Compl.¶ 31)

I will first address the implied right of action under DOT regulations (Count 1) which presents principally an issue of law. I will then review the standards for assessing a motion for summary judgment and turn to each of the more fact-dependent common law claims (Counts 2–4).

### Count 1: Implied Right of Action under the Statute and DOT Regulations

■ United asserts a claim premised upon the payment protection regulations promulgated by the DOT pursuant to the Federal Aviation Act. 49 U.S.C. § 40101 et seq. It asserts that Valley is "legally bound" by the DOT regulations and that "[p]ursuant to the [DOT] Payment Protection Regulations, United Bank is entitled to be reimbursed by Valley Bank for refunds made to Visa and MasterCard purchasers of cancelled Southeast flights." (Compl.¶ 42) I conclude that no right in favor of a merchant bank, such as United, is created under the relevant statutes and regulations and no private remedy is implied in favor of a merchant bank as against a depository bank.

In *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the Supreme Court considered "whether private individuals may sue to enforce disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964." *Id.* at 278, 121 S.Ct. 1511. It concluded that they could not. The Court noted that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* at 286, 121 S.Ct. 1511. Without such statutory intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87, 121 S.Ct. 1511; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).

Here, rights-creating language is absent from the statute pursuant to which the payment protection regulations were adopted. *See Alexander*, 532 U.S. at 288, 121 S.Ct. 1511. Section 40101 sets out the many and varied goals in enacting legislation to promote air commerce and air safety but none remotely touch upon the protection of institutions electing to provide credit card-type merchant banking services to air carriers. Section 40101 allows for certain economic regulation of air carriers and authorizes the Secretary of Transportation to promulgate regulations but, again, merchant banks are not named, directly or indirectly, among the protected persons. More generally, United cites to no provision of Title 49, Subtitle VII, Part A, Subpart II (economic regulation) that speaks to the rights and duties of depository institutions relative to merchant banks issuing credit cards or lends supports to the proposition that the statute intended to create a remedy in favor of a merchant bank.

It is noteworthy that, in promulgating the regulations, the DOT displayed a decided preference to avoid directly regulating depository banks. Instead, it required the regulated air carrier to enter into a contractual relationship with the depository bank and dictated certain mandatory terms and conditions in the contract.

I conclude that a private right in favor of a merchant bank against a depository bank cannot be implied from the statute or the regulations. I also conclude that there is no indication that Congress intended to create a private remedy.

In *Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81 (1st Cir.2004), the First Circuit had occasion to examine whether a private right of action existed under DOT regulations, including Part 380 governing Public Charters, in favor of a party who had entered into a charter agreement with an air carrier who subsequently ceased operations. The *Bonano* Court examined the enforcement and investigative powers given to the Secretary of Transportation and concluded that "[t]his plainly exhibits Congress's preference for *public* enforcement." *Id.* at 85 (emphasis in the original). It noted that in one particular instance Congress had intended to create a private remedy. *Id.* Section 46108 of Title 49 expressly provides that "[a]n interested person may bring a civil action in a district court of the United States against a person to enforce section 41101(a)(1) of this title." Section 41101(a)(1) permits an air carrier to provide air transportation only if it holds the required certificate. The Court reasoned that the specificity with which the statute creates this private right of action is suggestive of intent not to create it elsewhere. *Bonano*, 365 F.3d at 85; *see County of Westchester v. New York*, 286 F.3d 150, 152 (2d Cir.2002) (per curiam) ("Since Congress expressly provided a private right of action in favor of certain

groups, ... but did not expressly provide a private right of action in favor of a county, educational agency or any other entity ..., we find it extremely unlikely that Congress intended to do so.").[3]

There is no basis to conclude that Congress or the DOT intended to create either a private right or a private remedy in favor of a merchant bank providing credit card services to an air carrier. Summary judgment is granted in favor of Valley on Count 1 of the Complaint.

*United's Common Law Claims*

United asserts that it is a third-party beneficiary of the Instructions and that the Instructions have been breached (Count 2). It also asserts a claim of breach of an alleged oral agreement between Valley and United (Count 3). Further, United asserts that, based upon the surrounding facts and circumstances, a fiduciary relationship arose in which Valley owed duties to United (Count 4). Finally, United seeks an accounting (Count 5).

It is useful to begin with a review of the standards governing a motion for summary judgment. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, dem-

onstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir. 2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir. 1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judg-

---

**3.** Whether analyzed under *Alexander v. Sandoval* or under the four-part test in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), cited in the brief per curiam opinion in *County of Westchester,* 286 F.3d at 152, the result is the same because the absence of Congressional intent dooms the implication of the private right of action. I note that Judge

Lynch of this District, citing *Bonano* and other cases, recently declined to find a private right of action under Federal Aviation Act, in favor of a person who had contracted with an air carrier who ceased operations. *See Weiss v. El Al Israel Airlines, Ltd.,* 433 F.Supp.2d 361 (S.D.N.Y.2006).

ment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. Fed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.* Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348); *see also Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (noting that summary judgment should be granted if the evidence is "merely colorable" or "not significantly probative").

*Counts 2: The Instructions*

United asserts that it is a third-party beneficiary of the Instructions and entitled to enforce them against Valley. It makes no claim of third-party beneficiary status under the depository agreements. Indeed, the language of the two depository agreements, previously quoted herein, would preclude any serious argument that the parties thereto, Southeast and Valley, intended to confer third-party beneficiary status upon anyone. (Direct Air Agreement ¶ 27; Public Charter Agreement ¶ 7.12)

The Instructions were written on Southeast's Florida letterhead and addressed to Valley in New York; they are signed by both entities. The threshold question is

under which jurisdiction's law United's third-party beneficiary status is to be assessed. Both sides cite New York cases and federal cases applying New York law in addressing the substantive claim.

■ The choice of law rules of the forum state, New York, govern in this diversity action. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "[T]he first step in any choice of law inquiry is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir.2002) (citing *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 937 (1993)). If a conflict is found in the substantive law, then, in the absence of an express choice of law provision, New York would apply a "center of gravity" or "grouping of the contacts" approach with regard to a contract claim. *Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co., Inc.,* 295 F.3d 256, 260–61 (2d Cir. 2002) (citing *In re Allstate,* 597 N.Y.S.2d 904, 613 N.E.2d at 940–41). "[C]ourts may consider a variety of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Id.* at 261, 597 N.Y.S.2d 904, 613 N.E.2d 936.

Here, with respect to the claim of third-party beneficiary status under the Instructions, no significant variance exists between the law of New York, where Valley is located and the deposits appear to have been maintained, and Florida, where Southeast and the would-be third-party beneficiary is located.[4]

---

4. I also note that each of the depository agreements is governed by New Jersey law. In any event, there appears to be no feature of

New Jersey third-party beneficiary law that would be outcome determinative. New Jersey requires that the contracting parties in-

■ For a third-party beneficiary to succeed on a breach of contract claim under New York law, the party "must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his or her benefit, and (3) that the benefit to him or her is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *BDG Oceanside, LLC v. RAD Terminal Corp.*, 14 A.D.3d 472, 787 N.Y.S.2d 388, 390 (App. Div.2d Dep't 2005). While the third-party beneficiary does not have to establish that it is explicitly mentioned in the contract, New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract. *See Strauss v. Belle Realty Co.*, 98 A.D.2d 424, 469 N.Y.S.2d 948, 951 (App. Div.2d Dep't 1983); *see also Port Chester Elec. Constr. Co. v. Atlas*, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976).

■ Under Florida law, to establish third-party beneficiary status, the party must prove four elements: "(1) existence of a contract; (2) the clear or manifest intent of the contracting parties that the contract primarily and directly benefit the third party; (3) breach of the contract by a contracting party; and (4) damages to the third party resulting from the breach." *Found. Health v. Westside Ekg Assocs.*, 944 So.2d 188, 195 (Fla.2006) (internal quotations omitted). "The question of whether a contract was intended for the benefit of a third person is generally regarded as one of construction of the contract. The intention of the parties in this respect is determined by the terms of the contract as a whole, construed in the light of the circumstances under which it was

made and the apparent purpose that the parties are trying to accomplish.'" *Carvel v. Godley*, 939 So.2d 204, 207–208 (Fla. 4th Dist.Ct.App.2006) (quoting *Moyer v. Graham*, 285 So.2d 397, 402 (Fla.1973)).

While expressed in different formulations, there is no outcome determinative difference between New York and Florida law on determining who is entitled to third-party beneficiary status. Both jurisdictions look to the intent of the parties. New York requires that the benefit to the third-party be immediate and not incidental, while Florida law speaks of a primary and direct benefit to the third-party.

■ Here, United satisfies the required elements under each jurisdiction's law to be considered a third-party beneficiary. The Instructions manifest the intent that United—who is expressly named in the Instructions—have the ability to make a "request" for the release of passengers' funds and that Southeast authorize the release of those funds under the specified "conditions." Each of the three conditions references United by name. I conclude that under New York and Florida law, United is a third-party beneficiary of the Instructions.

■ United argues that the Instructions should be construed to mean that monies owed to passengers due to cancellation of a flight must be paid to it by Valley provided that United makes a proper request and the passengers' funds were originally transferred to Southeast utilizing United's merchant services. United views this as an unconditional obligation of Valley's that is not dependent upon whether Valley ever received the funds from Southeast. United views it as Valley's obligation to moni-

tend the third party to receive a benefit which may be judicially enforced. *See, e.g., Rieder Communities, Inc. v. Twp. of N. Brunswick*,

227 N.J.Super. 214, 546 A.2d 563, 566, *certif. denied*, 113 N.J. 638, 552 A.2d 164 (1988).

tor and confirm the propriety and adequacy of Southeast's deposits.

United endeavors to find support for its interpretation of the Instructions in the first condition to release of funds to United which states as follows: "Said passengers' funds were escrowed for flights arranged by Southeast ..., cancellation of specific flights will be certified by Southeast.... In the event that cancelled flights can't be certified by Southeast ..., any monies owed due to cancellation will be returned to United Bank." More particularly, United argues that Valley had a contractual obligation to make good any shortfall by Southeast because the language says that "any monies owed due to cancellation will be returned to United Bank."

There is no parol evidence in this record to explain any term, ambiguous or otherwise, in the Instructions. United does not dispute that William Dews, a former flight attendant then employed by Southeast, drafted the Instructions and that Mr. Dews does not remember anything about how or why he drafted the Instructions or the meaning of any portion of its language. While the president of United, Harold J. Winner, answered affirmatively to a deposition question inquiring whether he was "involved at all" in the drafting of the Instructions, he said that his involvement was in speaking to another employee urging that it be accomplished. Winner denied participating in—or even knowing of—any communication with Valley that would support United's present contract interpretation:

> Q. To your knowledge, did anyone at Valley National Bank ever advise anyone at United Bank that Valley National Bank would cover all chargebacks incurred by United Bank even if there were not sufficient funds in the depository account to cover those chargebacks?
> * * * * * *

> A. Not to my knowledge.

(11/16/05 Winner Dep. 94)

Construing the Instructions, I conclude that the reference to "any monies owed due to cancellation" refers to such monies as Valley, in fact, had on deposit from Southeast attributable to that cancelled flight. Indeed, the subject line of the letter is "Release of funds for cancelled Public Charter flights ...." which implies that only monies that Valley had on hand from Southeast would be paid over, i.e. "release[d]", to United. The proffered interpretation of the language, that Valley had agreed to make good any shortfall on sums deposited by Southeast, is wholly unreasonable.

### Count 3: The Alleged Oral Contract Between Valley and United

Count 3 of the Complaint alleges that Valley "represented that[ ] it would hold and protect the money that United Bank deposited into the escrow account by segregating the money deposited in the escrow account by flight and passenger, disbursing money only after Southeast completed and certified completion of each individual flight, and reimbursing United Bank for refunds made to Visa and MasterCard purchasers of cancelled flights." (Compl.¶ 56) United asserts that "Valley Bank's offer, course of conduct and United Bank's acceptance of the offer creates a contract [sic] defines the duties and responsibilities of the parties." (Compl.¶ 58) While the allegation is more than ample to allege the existence of a contract, United may not, at this juncture, rest upon its allegations. Despite a full opportunity to conduct discovery, the evidence of record does not provide a basis from which a reasonable jury could conclude that there was a contract be-

tween United and Valley on the subject of the deposits.[5]

Winner swears that United Bank agreed to serve as Southeast's merchant bank only because of the agreements between Southeast and Valley. Winner testified that neither he nor, to his knowledge, any employee of United ever reviewed the DOT regulations on depository agreements at any time prior to Southeast ceasing operations in late 2004.

Winner asserts that well before Valley arrived on the scene, he was contacted by Southeast about the possibility of United serving as Southeast's merchant bank for MasterCard and Visa sales. He says he was concerned "[b]ecause travel services in which tickets are purchased for travel in the future, are considered inherently risky." (Winner Decl. ¶ 4) He contacted Atlantic Bank, the institution that then served the role of depository bank. Atlantic explained how the depository account was maintained and described the information that Southeast would supply with each deposit (Letter of September 13, 2000). Ms. Lori Rooney of Atlantic "assured" Winner that Atlantic would maintain a flight-by-flight accounting and that all funds received from the passengers would remain on deposit in the escrow account until Southeast both completed and certified completion of each individual flight for which payment had been made. Atlantic acknowledged a "Letter of Direction" from Southeast which was executed in September 2000. In reliance upon these representations from Atlantic, Winner, the president of United entered into the Merchant Agreement with Southeast.

United's submissions are highly selective in their interpretation of the earlier relationship between Atlantic and Southeast which they believe was the model or clone of Valley's relationship with Southeast. United glosses over the fact that new depository agreements were reached between Southeast and Valley which were filed with and approved by the DOT. It also fails to note that the Atlantic "Letter of Direction"—the document which is said to be a precursor of the Instructions—contained an indemnification by both Southeast and United of the depository bank—and not an indemnification of United by the depository bank.

While the precise nature of the transaction, if any, between Atlantic and Valley is not clear, it appears that in or about December 2000 Atlantic exited the escrow depository service field and Valley entered the business picking up many or all of Atlantic's employees in that area. Unlike the conversations with Ms. Rooney of Atlantic (who later went to work for Valley), Winner's declaration refers to no conversation that he personally had with a Valley employee until after Southeast ceased operation. He makes the following conclusory statement: "Valley Bank represented to United Bank that the terms of the escrow arrangement as they had existed at Atlantic Bank would remain the same at Valley Bank and asked United Bank to stop depositing funds at Atlantic Bank and start depositing them at Valley Bank." (Winner Decl. ¶ 14) In reliance upon the foregoing representations by a Valley employee he does not specify, Winner says that United agreed to deposit all funds from MasterCard and Visa purchases in Southeast's account at Valley. As noted, mere "conclusory statements, conjecture, or speculation by the party resisting the motion will

---

**5.** There is no discernable difference on the contract formation and interpretation issues under the law of New York or Florida.

not defeat summary judgment." *Kulak,* 88 F.3d at 71.

Winner says that in early 2001, Southeast temporarily suspended flight operations and United's account with Southeast "became inactive." He says that "Southeast, Valley Bank and United Bank negotiated an agreement similar in terms" to the Letter of Direction with Atlantic. Winner says that "United Bank relied on the Instruction Letter in reactivating the Merchant Agreement and depositing payments into the escrow account at Valley Bank."

I have also examined the 2004 conversations between Linda Marticiuc, Assistant Vice President of United, and Robert Halagarda of Valley. These conversations occurred long after the depository agreements between Valley and Southeast had been entered into and long after the Instructions were signed. At best, they provided comfort to United as to Valley's business practices. No reasonable fact finder could conclude that they were the basis for a contractual understanding between two purportedly sophisticated banks. Similarly, conversations between United and Valley personnel after Southeast ceased operations support no prior contractual relationship between the two banks.

If, at the close of the entire case, the only evidence before the jury is the potpourri on which United relies on the instant motion, the Court would be required to grant judgment in Valley's favor because no reasonable jury could conclude that there was an oral agreement between Valley and United by which Valley undertook responsibilities to United above and beyond those set forth in the Instructions. There is no evidence from which a reasonable jury could conclude that there was a meeting of the minds—a bargained for exchange—between United and Valley.

*Count 4: Breach of Fiduciary Duty*

██ United asserts that Valley became its fiduciary and owed it obligations as such. A claim of breach of fiduciary duty is analyzed under choice of law principles applicable to torts. *See, e.g., In re Bayou Hedge Fund Inv. Litig.,* 472 F.Supp.2d 534, 542 (S.D.N.Y.2007); *Reid v. Ernst & Young Global Ltd.,* 13 Misc.3d 1242, —— —— ——, 831 N.Y.S.2d 362, —— – ——, 2006 WL 3455259, at *6–7 (N.Y. Sup.Ct., N.Y. County 2006). The parties do not address the choice of law issues and appear to assume that New York law governs.

The New York Court of Appeals has held that "the relevant analytical approach to choice of law in tort actions in New York" is the "[i]nterest analysis." *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679, 684 (1985). The New York Court of Appeals has defined "interest analysis" as requiring that "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Id.* (internal quotations omitted). "Under this formulation, significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Id.*

Under the interest-analysis test, torts are divided into two types, "those involving 'the appropriate standards of conduct, rules of the road, for example' and those that relate to 'allocating losses that result from admittedly tortious conduct . . . such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit.'" *Mascarella v. Brown,* 813 F.Supp. 1015, 1019 (S.D.N.Y. 1993) (quoting *Schultz,* 491 N.Y.S.2d 90, 480 N.E.2d at 684–85) (alterations in original). "If conflicting conduct-regulating

laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 595 N.Y.S.2d 919, 612 N.E.2d 277, 280 (1993); *see Northwestern Mut. Life Ins. Co. v. Wender,* 940 F.Supp. 62, 66 (S.D.N.Y.1996). If the conflict involves allocation of losses, the site of the tort is less important, and the parties' domiciles are more important. *Cooney,* 595 N.Y.S.2d 919, 612 N.E.2d at 280–81. Here, Valley is organized under the laws of New Jersey and its corporate headquarters are alleged to be in New Jersey. It is alleged to operate eight branches in Manhattan. The Instructions were transmitted to Valley at a New York address where the employees administering the accounts were employed. The depository agreements are governed by New Jersey law. United Bank is organized under the laws of Florida and headquartered in St. Petersburg. Southeast was headquartered in Florida. On one hand, Florida has a strong interest in the protection of its banking institutions and their relationships with other banks. But New York has a strong interest in the disposition of escrowed funds in a banking institution operating within its borders. The global escrow operations of Valley appear to have been conducted in New York. Here, I conclude that, on the facts of record, neither Florida nor New York would find a fiduciary relationship between a depository bank and a merchant bank.

■■■ In New York, a fiduciary relationship arises " 'where one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' " *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir.1991) (quoting *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 521

N.Y.S.2d 672, 676 (App. Div. 1st Dep't 1987)) (alteration in original). A fiduciary duty may be one "imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contract agreement." *Apple Records, Inc. v. Capitol Records, Inc.,* 137 A.D.2d 50, 529 N.Y.S.2d 279, 281 (App. Div. 1st Dep't 1988); *see also Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900, 904 (App. Div.2d Dep't 1976), *appeal dismissed,* 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977) ("Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another.").

Fiduciary duties do not arise solely because one party has expertise that is superior to another. *See Ross v. FSG PrivatAir, Inc.,* 2004 WL 1837366, at *6 (S.D.N.Y. Aug. 17, 2004). New York courts have not hesitated to find fiduciary duty claims deficient when a plaintiff has not pled or proved facts demonstrating a fiduciary duty or "any relationship approaching privity." *Columbia Mem'l Hosp. v. Barley,* 16 A.D.3d 748, 790 N.Y.S.2d 576, 577 (App. Div.3d Dep't 2005); *see also Doe v. Holy See (STATE of Vatican City),* 17 A.D.3d 793, 793 N.Y.S.2d 565, 568 (App. Div.3d Dep't 2005), *leave to appeal denied,* 845 N.E.2d 1274 (N.Y.2006) (no fiduciary relationship between local church member and the Vatican).

■■■ Under Florida law, "[a] fiduciary relationship is not easily defined, but an essential aspect of such a relationship is a level of trust and confidence by the plaintiff that has been bestowed upon and accepted by the defendant." *Greenacre Properties, Inc. v. Rao,* 933 So.2d 19, 26 (Fla.2d Dist.Ct.App.2006) (citing *Doe v. Evans,* 814 So.2d 370, 374 (Fla.2002)). "The relation and duties involved need not be legal; they may be moral, social, domestic or personal. If a relation of trust

and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief. The origin of the confidence is immaterial." *Doe,* 814 So.2d at 371–375 (Fla.2002) (quoting *Quinn v. Phipps,* 93 Fla. 805, 113 So. 419, 421 (1927)).

▮ Turning to the facts of this case, United makes the claim that Valley held itself as "escrow experts" impliedly asserting that it, United, was not. United endeavors to convert an escrow arrangement that was created for the benefit of would-be passengers of Southeast into an escrow arrangement for United's benefit. The depository agreements between Southeast and Valley were not private documents. They were filed and approved by the DOT. United had or could have had the full text of those agreements which predate the existence of the Instructions. The depository agreements make no reference to the rights of merchant banks; they expressly disclaim the intention to confer rights on third parties. They draw no distinction between funds held by Valley in the case of a passenger who paid by MasterCard or Visa, as distinguished from one who paid by cash, check or other credit card. The Instructions were not, so far as the record appears, filed with the DOT and could not have altered the fundamental basis on which the funds were held pursuant to the depository agreements. Indeed, it is difficult to square the DOT regulations governing the content of a depository agreement with a fiduciary duty owed to one who is neither a party to the agreement nor a passenger.

It suffices for present purposes to conclude that the nature of the relationship between Valley and United, both as alleged in the Complaint and supported by the evidence on the motion, was not one of confidence and special trust such that New York or Florida would imply or impose a fiduciary duty on Valley.

*Count 5: An Accounting*

The equitable remedy of an accounting would have been appropriate had there been an equitable claim on which the plaintiff had prevailed. Certainly, plaintiff has had an ample opportunity to pursue discovery of Valley in this action. Plaintiff has failed to demonstrate a legal or equitable basis for this remedy on this record. Summary judgment is granted to Valley on this claim.

*Plaintiff's Motion for Summary Judgment*

Plaintiff moves for partial summary judgment on Counts 2, 3 and 4 as to the sums in the depository accounts. On this motion, I must construe the facts in a light most favorable to Valley and draw all reasonable inferences in its favor. It may well be that plaintiff will be entitled to summary judgment on its third-party beneficiary claim against Valley (Count 2), but it is not clear to me on this record whether there are any other persons who might have rightful claims on the same deposits, such as those would-be passengers, if any, who paid by check or credit cards other than MasterCard or Visa; nor is it clear to me whether all sums on deposit can be traced to persons to whom United has issued refunds. I will deny plaintiff's motion without prejudice to filing a new motion, tailored to the claim that survives. I will require plaintiff to serve the Department of Transportation (Attention: General Counsel) and the United States Attorney for this District with any renewed motion for summary judgment.

*CONCLUSION*

The motion of defendant Valley for summary judgment in its favor is granted as to

374

Counts 1, 3, 4, and 5 in their entirety. United's motion for partial summary judgment on Count 2 is denied. With respect to Count 2, I order, pursuant to Rule 56(d), that it is established that United may not recover against Valley more than the funds deposited as of the date of United's request for release of funds pursuant to the Instructions. I need not reach the issue of plaintiff's entitlement *vel non* to prejudgment interest on the funds actually held by Valley. Plaintiff's motion for leave to seek punitive damages is denied because no claim that would support a punitive damage award has survived.

Plaintiff's motion to exclude the expert testimony of Jane Cloninger and Pascal Burg is denied as moot. The testimony would not appear to be relevant to the only surviving claim.

Guided by this Memorandum and Order, it is this Court's fervent hope that these two banks will now see fit to sit down and work out an intelligent resolution of the remaining issues.

SO ORDERED.