**ALITALIA LINEE AEREE ITALIANE, S.P.A., Plaintiff,**

v.

**AIRLINE TARIFF PUBLISHING COMPANY, Defendant.**

No. 07 Civ. 756(PKC)(RLE).

United States District Court, S.D. New York.

Sept. 5, 2008.

Eugene Frank Massamillo, Thomas Guy Carulli, Kaplan, von Ohlen & Massamillo, L.L.C., New York, NY, Jonathan Hill, Erkmann, Dow Lohnes, PLLC, Washington, DC, for plaintiff.

Elizabeth Anne Musella, Joshue Daniel Rievman, Hoguet Newman & Regal, LLP, New York, NY, John Parker Erkmann, Dow Lohnes & Albertson, PLLC, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

Plaintiff Alitalia Linee Aeree Italiane, S.p.A. ("Alitalia") brings this diversity action against defendant Airline Tariff Publishing Company ("ATPCO") seeking damages for breach of contract, breach of fiduciary duty, negligence and gross negligence. The claims arise out of the posting by ATPCO of certain Alitalia air fares without noting that the fares were only available in a "low season." The mistaken information was posted on a Friday and, by the time it was corrected on Monday, tickets had been sold to the public at an alleged loss to Alitalia of over $3.7 million. Both parties have moved for summary judgment in their favor. Rule 56, Fed. R.Civ.P. For the reasons outlined below, Alitalia's motion is denied and ATPCO's motion is granted.

### I. Background

Alitalia is the national air carrier of the Republic of Italy and conducts regularly scheduled flights between Europe and the United States. (Def. Resp. to Pl. 56.1

Stmnt. ¶ 2.) Its North American operations have their headquarters in New York. (Brazzit Decl. ¶ 2.) ATPCO is a corporation organized under the laws of the District of Columbia and is headquartered in Virginia; it is in the business of publishing and distributing airfares, as well as filing airfares with the governments of different countries. (Pl. Resp. to Def. 56.1 Stmnt. ¶ 1.) ATPCO is owned by 24 domestic and international airlines (Kirk Decl. ¶ 9), and serves as agent for more than 500 air carriers for filing and publishing their airfares. (Pl. Resp. to Def. 56.1 Resp. ¶ 6.) Rather than seeking to maximize financial return to shareholders, ATPCO seeks to provide its service to the airline industry at the lowest possible cost. (Kirk Decl. ¶ 11.) Its board of directors is made up entirely of the airline owners of ATPCO. (Perkins Dep. at 118.) ATPCO has a policy of non-discriminatory pricing such that non-shareholder airlines pay the same fees as the shareholder airlines (Kirk Decl. ¶ 12.), and its board of directors has directed that the company be managed on a cash flow neutral basis. (Kirk Decl. ¶ 11; Zazzi dep. 150–51.)

ATPCO maintains a database of airfares and the rules and restrictions pertaining to those airfares and electronically distributes such data to nearly all the world's airfare quotation and airline ticketing systems. (*Id.* ¶¶ 4–6; Zazzi Dep. at 39.) The distribution of data occurs several times each weekday on a set schedule and is known as a "pull" or a "subscription pull." (Braun Dep. at 49–50.) While ATPCO distributes airfare data, it does not issue or sell airline tickets or book airline reservations. (Kirk Decl. ¶ 8.) The entities to which ATPCO distributes data are referred to in the airline industry as Global Distribution Systems ("GDS") or Customer Reservation Systems ("CRS"). (*Id.* ¶¶ 12 n. 8, 13.)

Once the GDSs receive airfare data published by ATPCO, they incorporate additional information such as scheduling and seat availability before making tickets available for sale by airlines, travel agents and on-line ticketing services. (*Id.* ¶ 6.) Airline customers of ATPCO have the choice of entering their airfare data directly into ATPCO's database or having ATPCO do it by sending relevant instructions to ATPCO. (Zazzi Dep. at 38, 44–45; Dezelak Dep. at 8.)

The business relationship between Alitalia and ATPCO is governed by a contract titled "Data Bank Participation Agreement" executed in 1986. (Erkmann Decl., Exh. A.) The contract contains a limitation of liability clause which states:

> ATPCO will use its best efforts to assure that data supplied by Participant hereunder is promptly and accurately incorporated into, and made available for distribution as part of, ATPCO's data base; however, it cannot and does not warrant the timeliness, accuracy, or completeness of the data so incorporated, nor can it assume any liability for consequential damages resulting from any delay in, or error or omission made in the course of, such incorporation or subsequent distribution of such data.

(*Id.* ¶ 5.) In addition, the contract states that "ATPCO will act solely as agent for, and, subject to the provisions of this agreement, on instructions from, Participant in including such data in its computer data bank and distributing them." (*Id.* ¶ 2.)

Prior to 2003, ATPCO was organized by region. It had a trans-Atlantic department, a trans-Pacific department, a western hemisphere department and a U.S. domestic department. (Braun Dep. at 7.) Within each regional department, ATPCO analysts would code and process airfare data for flights operating in their department's particular region. Auditors within

the regional groups would check the work of the coding and processing analysts. (*Id.* at 24–25.) When there was an imbalance in the workload among the regional departments, coding and processing analysts from a less busy group would help by coding and processing airfare instructions for a group with a heavier workload. (Braun Dep. at 12.)

In an attempt to "streamline" ATPCO, it underwent reorganization and eliminated its regional departments, replacing them with four coding and processing ("CAP") groups and one "Operations Quality Assurance Team" ("QA team") which did the auditing of all the CAP groups. (*Id.* at 34–37.) Rather than being responsible for each flight route in a particular region, each CAP group was responsible for a particular group of carriers without regard to the regional location of the air routes. (*Id.* at 35.)

Under the new organization, if an air carrier did not wish to code and process its own airfare data, it would send an airfare instruction by either facsimile or email to ATPCO's telecommunications department. (Braun Dep. at 40.) The instructions would then be delivered to the appropriate CAP group charged with processing the particular air carrier. (*Id.* at 40, 259.) A manager would review the instruction for completeness and then deliver it to a coding and processing analyst who would begin entering the airfare information into the database. (*Id.* at 41.) If a written instruction from an air carrier was unclear to the analyst, the analyst consulted a "cue sheet" maintained by APTCO for each airline that "gives the coders advice on how to code certain provisions." (Braun at 121.)

After inputting the airfare data, the coding and processing analyst would then check the accuracy and completeness of the coding before indicating in the ATPCO computer system that the airfare instruc-

tion was ready for audit. (Sam Dep. at 59–60, 96.) The carriers' written instruction would then be sent to the QA team and placed in a "queue" for auditing. (Braun Dep. at 40–45.) When the instruction reached the top of the audit queue, the next available auditor would compare the written instructions with what had been entered into the computer system by the coding and processing analyst. (*Id.* at 42, 259; Def. 56.1 Stmnt ¶ 16.) When one of the CAP group's received more airfare instructions than its members could handle, a member or members of the Quality Assurance team would be assigned to help with the coding and processing for the CAP group in need. (*Id.* at 208.)

When ATPCO made an error incorporating or distributing airfares, its policy was to refund the increased cost of fixing the error to the customer. (Exhs. AZ5 at ATP 19044; AZG at ATP 19095; AZ30 at ATP 10285; AZ41 at 10194.)

On Friday, February 6, 2004, Alitalia sent a fax to ATPCO with instructions to reduce its airfares in ATPCO's database for flights between the United States and Europe. (Zazzi Dep. at 80; Sam Dep. at 100; Erkman Decl., Exh. C.) The instructions specifically stated that the reduced airfares were to be applicable only to the "low season," the period between February 21 and April 4. (*Id.*) CAP 3, the ATPCO department that typically handled Alitalia airfares, was "overwhelmed," so the Alitalia instructions were sent directly to ATPCO's QA team where APTCO auditor, Senior Analyst Charity Sam, coded and processed the Alitalia instruction and mistakenly entered ATPCO's date-restriction code for trans-Pacific flights rather than trans-Atlantic flights. (Sam Dep. at 11, 29–30.) Specifically, the mistake was made when Sam entered the number "41" instead of "40" into the date restriction data field. (Braun Dep. at 227.) The mis-

take had the effect of negating Alitalia's instruction of reducing fares only during the "low season" because the code applied the date restriction only to trans-Pacific routes and Alitalia did not fly any trans-Pacific routes. (Sam Dep. at 106–07; Dezelak Dep. at 44–45; Zazzi Dep. at 87, 93, 136.) Thus none of Alitalia's routes were subject to the intended date restriction. (Zazzi Dep. at 69, 87, 100–01, 105–06.) ATPCO's computer system revealed that the coding and processing of the Alitalia instruction took approximately one hour while the auditor spent approximately 3 minutes reviewing the data. (Sam Dep. 15, 59–60; Lee Dep. at 8–9.) The coding mistake was not detected by either the coding and processing analyst or the auditor. (Sam Dep. at 59–60, 70–71; Perkins Dep. at 82, 159; Zazzi Dep. at 87–88.)

On Monday, February 9, 2004, Alitalia was contacted by Sabre Holdings, a GDS, about suspicious sales prices on Alitalia airfares. (Zazzi Dep. at 88, 164, 185–88.) After an immediate investigation, Alitalia determined that tickets had been sold at incorrect prices over the weekend. (*Id.*) Upon learning of the problem, ATPCO promptly fixed the error. (*Id.* at 100, 103–06, 118.)

The error at issue here is not the first time ATPCO has made coding errors resulting in tickets being sold at incorrect prices. Other airlines that have suffered losses due to an ATPCO error include Air Jamaica (Exh. AZ30), Destina Air (Exh. AZ31; Perkins Dep. 17–18), Air Canada (Exh. AZ31; Perkins Dep. 17–18, 28–29), Northwest Airlines (Perkins Dep. at 34–35), and United Airlines. (Exh. AZ39.) However, prior to this action, no airline had ever sued ATPCO for revenue losses that were allegedly caused by an ATPCO's mistake. (Kirk Decl. ¶ 16.)

Alitalia filed its complaint in this action on January 31, 2007, seeking $3,725,591 in lost revenue plus pre-judgment interest.

(Doc. # 1.) On March 30, 2007, this Court ordered the bifurcation of discovery with damages discovery to be undertaken after the rulings on the parties' motions for summary judgment on liability. (Doc. # 12.)

Alitalia asserts it is entitled to summary judgment on liability because ATPCO concedes its error caused GDSs to sell Alitalia tickets at incorrect prices and such error was a breach of contract. It argues that the limitation of liability clause is inapplicable to the error at issue and contends that ATPCO, as agent for publishing Alitalia's prices, owed Alitalia a fiduciary duty, independent of any contractual duties, and that as a result of the error, ATPCO breached the fiduciary duty it owed to Alitalia. Finally, Alitalia asserts that ATPCO had a history of similar mistakes, could have easily prevented the instant error from occurring, did not follow proper procedures and failed to properly train its employees. Based upon these assertions, Alitlaia claims that ATPCO was not merely negligent but grossly negligent.

ATPCO contends that, as a matter of law, it cannot be held liable for the consequential damages sought by Alitalia by virtue of the limitation of liability clause and that the mistake it made was the result of a typographical error and not negligent.

### a. *Choice of Law*

The choice of law rules of the forum state, New York, govern in this diversity action. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "[T]he first step in any choice of law inquiry is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir.2002) (citing *In re Allstate Ins. Co.*, 81 N.Y.2d

219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993)). If no conflict is found between the law of the forum and any other jurisdiction whose law is invoked, then the Court should apply the law of the forum. *See Excess Ins. Co. v. Factory Mut. Ins. Co.*, 2 A.D.3d 150, 151, 769 N.Y.S.2d 487 (1st Dep't 2003).

■ Plaintiff urges that New York law apply to all issues in this case. Alternatively, it argues that Italian law should apply but it has not pointed to any differences between New York and Italian law; it also notes that ATPCO has not done so. (Sept. 3, 2008, Letter of Massamillo at 3.) Defendant argues that Virginia law governs but notes that it finds no conflict between New York and Virginia law on any material issue, except one—the enforceability of a contractual term in an agreement between commercial parties exculpating or limiting the liability of one of the parties for gross negligence. *Compare Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) with *Ripley Heatwole Co. v. John E. Hall Electrical Contractor, Inc.*, No. L04–1556–01, 2005 WL 4827398, at *3–4 (Va.Cir.Ct. Aug. 24, 2005).

Because there is a conflict in the substantive law of New York and Virginia on an issue governing the contract claim, New York would apply a "center of gravity" or "grouping of the contacts" approach, in the absence of an express choice of law provision. *Tri–State Employment Servs., Inc. v. Mountbatten Sur. Co.*, 295 F.3d 256, 260–61 (2d Cir.2002) (citing *In re Allstate Ins. Co.*, 81 N.Y.2d at 227, 597 N.Y.S.2d 904, 613 N.E.2d 936). "[C]ourts may consider a variety of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Tri–State*, 295 F.3d at 261.

There is no claim that the contract was the subject of actual negotiation; ATPCO does not challenge the assertion that it was executed by Alitalia at its North American headquarters in New York. (Sept. 3, 2008, Erkmann Letter at 5.) Alitalia argues that its injury occurred in Italy, New York, Florida, Massachusetts or Illinois or some combination of the foregoing. (Sept. 3, 2008, Letter of Massamillo at 2.) While Alitalia asserted in its complaint that the "acts, events, occurrences and omissions giving rise to the claims alleged herein occurred in the State of New York" (Compl.¶ 5), that allegation is not supported by the evidence. The airfare instructions were sent from Alitalia's office in New York to Virginia, the location of ATPCO's operations. It was foreseeable that any data input error by ATPCO would occur at ATPCO's offices in Virginia and be disseminated from Virginia. Indeed, the error occurred in Virginia and was disseminated from Virginia. On balance, and taking the record on the cross-motions as a whole, this Court concludes that the center of gravity of the contract claim is Virginia, where the data was improperly entered and disseminated to third-parties causing the alleged injury.

b. *The Applicability and Enforceability of the Limitation of Liability Provision*

■ As noted, on its face, the agreement between the parties limits the liability of APTCO. Specifically, it provides that APTCO "cannot and does not warrant the timeliness, accuracy, or completeness of the data so incorporated [into APTPCO's database], nor can it assume any liability for consequential damages resulting from any delay in, or error or omission made in the course of, such incorporation or subsequent distribution of such data." (Erkmann Decl., Exh. A at ¶ 5.).

Alitalia seeks to avoid enforcement of the limitation of liability clause by claiming, *inter alia*, that the code mistakenly entered by ATPCO that negated the seasonal instruction was data supplied by AT-PCO, not by Alitalia. Specifically, Alitalia points to the language in the clause that states, "ATPCO will use its best efforts to assure that *data supplied by Participant* hereunder is promptly and accurately incorporated into, and made available for distribution." (Contract ¶ 5. (emphasis added).) Because the information provided by Alitalia did not contain an error, Alitalia argues that the rest of the clause limiting the liability of ATPCO does not here apply. Alitalia's argument fails. The unambiguous limitation of liability clause applies to "any ... error or omission made in the course of, such incorporation ...." of Alitalia's data into the ATPCO system. (*Id.*) Because the wrong code was used "in the course of" incorporating Alitalia's airfare data, the limitation of liability applies regardless of whether the code at issue is viewed as belonging to Alitalia or ATPCO. *See Duse v. IBM*, 252 F.3d 151, 158 (2d Cir.2001) ("Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms ...."); (internal quotations and citation omitted); *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."); *see also Levisa Coal Co. v. Consolidation Coal Co.*, 276 Va. 44, 57, 662 S.E.2d 44, 51 (2008) ("[W]hen the terms of a contract are clear and unambiguous, a court must give them their plain meaning.") (internal quotations omitted) (quoting *Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp.*, 263 Va. 169, 556 S.E.2d 769, 771 (2002)). There is no dispute that the CAP analyst entered the wrong code while incorporating data supplied by Alitalia into the ATPCO database and no reasonable juror could conclude that the analyst's entering "40" instead of "41" while executing an Alitalia fare change was not part of the process undertaken by the analyst in incorporating the Alitalia information into the ATPCO database.

■ Alitalia also argues that the bar on recovery of consequential damages does not impact its claim because, among other things, the damages it seeks are "direct" or general damages and not consequential. This argument also fails. "Direct damages are those which in the ordinary course of human experience can be expected to result from a breach. Consequential damages on the other hand arise from the intervention of special circumstances not ordinarily predictable, but are found to be within the contemplation of both contracting parties." *Westerra Reston, L.L.C. v. Walker*, 54 Va. Cir. 58, 2000 WL 1210027, at *2 (Va.Cir.Ct. June 2, 2000) (citing *Blue Stone Land Company v. Neff*, 259 Va. 273, 277–278, 526 S.E.2d 517 (2000)); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 175–176 (2d Cir.2000) (citation omitted) ("A plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised.... Special or consequential damages, on the other hand, seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach."). The performance contemplated in the contract governing the relationship between the parties is ATPCO's coding and distributing airfare data for a fee. Alitalia seeks damages for lost revenues on tickets sold at the incorrect price, not for the diminished value of ATPCO's performance under the contract.

In support of its argument that its lost revenues constitute direct damages, Alitalia makes the conclusory assertion—not

supported by any evidence submitted on this motion—that ATPCO itself sold Alitalia airfares at the incorrect price. (*See* Pl. Resp. to Def. 56.1 Stmnt ¶ 4.) The governing contract defines the service ATPCO was to provide to Alitalia as "collecting airline fares, rates and other related information, organizing and storing them in its computer data bank, and making them available for distribution, by various means, to the travel industry and the general public." (Contract Whereas Clause at 1.) In the face of the evidence put forward by ATPCO that it is only in the business of publishing fares, and in the absence of evidence supporting a contrary conclusion, no reasonable jury could conclude that APTCO sold seats on Alitalia flights at incorrect prices. Indeed the record demonstrates that the sales at issue were made by 27 travel agencies and travel websites, including the well-known sites, Expedia and Orbitz; no sales were made by ATPCO. (Exh. AZ18 at 09997.) Nothing in the record supports a claim that APTCO had any ownership interest in any of those companies or that those companies had ownership interest in ATPCO.

■ Alitalia asserts that, regardless of how this Court rules on any claim of negligence or negligent performance of the contract, its claim against ATPCO for gross negligence survives. As noted above, this Court concludes that Virginia law applies to the limitation of liability provision of the contract. "In Virginia, parties may limit their risk of loss through contract, as 'it is apparently not against the public policy ... for one to contract against his own negligence in some situations.'" *Kocinec v. Public Storage, Inc.*, 489 F.Supp.2d 555, 558 (E.D.Va.2007) (quoting *Nat'l Motels, Inc. v. Howard Johnson, Inc.*, 373 F.2d 375, 379 (4th Cir.1967)). With certain statutory exceptions (e.g. for common carriers), Virginia generally enforces contractual limitations of liability and does not view them as against public policy. *Nido v.*

*Ocean Owners' Council,* 237 Va. 664, 378 S.E.2d 837, 838 (1989). A Virginia court has upheld a limitation of liability in a tariff against all claims in contract or tort arising from a failure to connect repeated calls to a 911 system. *Pettit v. Chesapeake & Potomac Tel. Co. of VA,* 28 Va. Cir. 112, 1992 WL 884663, at *6–7 (Va.Cir. Ct. May 6, 1992). The Court left open the possibility that the limitation of liability would not apply to "willful or wanton" acts. *Id.* at *6.

One Virginia Court has considered whether a claim of gross negligence by the owner of an apartment complex struck by lightening could proceed against the alarm company in the face of a limitation of liability provision in their contract when the alarm company allegedly delayed in notifying the fire department. *Ripley Heatwole Co. v. John E. Hall Elec. Contractor. Inc.,* No. L04–1556–01, 2005 WL 4827398 (Va.Cir.Ct. Aug. 24, 2005). In upholding the limitation of liability against claims for gross negligence, the court described "the freedom of parties to limit their risks in commercial transactions" as "one of the essential purposes of contract law." *Id.* at *2.

> [T]o allow an allegation of gross negligence to defeat a contract defense or support a tort claim between contracting parties 'on equal footing' would undermine the reliance the parties justifiably place on their negotiated rights and obligations, and expose them to liability they did not likely intend at the time they contracted.

*Id.* at *4. This Court concludes that Virginia would enforce a limitation on liability, including a limit on claims in gross negligence, in a contract between sophisticated commercial entities.

■ Turning to plaintiff's tort claims, neither New York law nor Virginia law are different in their requirement that, to be

enforceable in tort, a duty must exist apart from any duty existing under the contract.[1] Virginia does not allow an injured party to bring a claim in tort where no common law duty has been breached and the duty arises solely from the contract. "To avoid turning every breach of contract into a tort, ... we have enunciated the rule that, in order to recover in tort, 'the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract.'" *Augusta Mut. Ins. Co. v. Mason*, 274 Va. 199, 645 S.E.2d 290, 293 (2007) (citing *Kamlar Corp. v. Haley*, 224 Va. 699, 299 S.E.2d 514, 517 (1983)). *See Richmond Met. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 507 S.E.2d 344, 347 (1998); *Malpass v. Callahan Const. Inc.*, 57 Va. Cir. 116, 2001 WL 1772695, at *1 (Va.Cir.Ct. Oct. 30, 2001). For example, in *Ripley Heatwole Co.* the plaintiff had asserted claims for gross negligence both in tort and in contract. The Court concluded that where the duty to notify the fire department arose from the contract between the parties, only a claim in contract survived. "[A]bsent the contract [the installation contractor] would have had no common law duty to the plaintiff to call the fire department; their relation arose *ex contractu*. Therefore the plaintiff may only sue [the installation contractor] in contract, not in tort." 2005 WL 4827398 at *4.

█ New York follows the same rule. To bring a tort action along side a contract claim, the alleged breach of duty must be distinct from, or in addition to, the breach of contract. *Clark–Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 389, 521

N.Y.S.2d 653, 516 N.E.2d 190 (1987) (distinct duty must "spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."); *Luxonomy Cars, Inc. v. Citibank, N.A.*, 65 A.D.2d 549, 550, 408 N.Y.S.2d 951 (2d Dep't 1978) ("Abstractly, a tort may accompany a breach of contract, but only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is also violated") (citing *Rich v. New York Cent. & Hudson R.R. Co.*, 87 N.Y. 382 (1882)).

In the absence of a contract, ATPCO would have no duty to enter data. The standard of care governing the entry of data is solely a function of a private bargain between sophisticated parties who, at the time of contracting, were best able to assess the value of the data, the consequences of an error and the pricing needed to meet the contractual standard. The parties could have bargained for multiple layers of quality control or refrained from placing limits on remedies. Presumably, pricing would have been adjusted accordingly.

█ This Court concludes that plaintiff's claims are premised solely upon a contractual duty, that the limitation of liability provision applies to ATPCO's coding error and that Alitalia's lost revenue and profits claim is for consequential damages and is barred. Further, under Virginia law, the limitation of liability applies with equal force to Alitalia's claim that ATPCO acted with gross negligence.

---

1. New York applies an "interest analysis" to tort claims. *See Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (discussed in this Court's opinion in *Synovus Bank of Tampa Bay v. Valley National Bank*, 487 F.Supp.2d 360, 371–372 (S.D.N.Y.2007)). The absence of a material conflict on the issue of whether a claim in tort may be asserted along side a contract claim dispenses with the requirement of a further choice of law analysis.

██ But even if this Court had applied New York law to the enforceability of the limitation of liability provision, the outcome would not be different. New York generally prohibits parties from contractually exculpating or limiting liability for gross negligence. *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) ("It is the public policy of this state ... that a party may not insulate itself from damages caused by grossly negligent conduct."). However, in a contract between sophisticated parties, not implicating public health or safety, New York applies a more exacting standard of gross negligence than it would in other contexts. *Id.* The New York Court of Appeals has held that, to avoid enforcement of a limitation of liability provision, the evidence must approach reckless indifference or intentional wrongdoing: "Gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must 'smack[ ] of intentional wrongdoing' ... It is conduct that evinces a reckless indifference to the rights of others...." *Id.* (citing *Kalisch–Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983) and Restatement [Second] of Contracts § 195[1] ). On the evidence that plaintiff has submitted, no reasonable jury could conclude that ATPCO engaged in gross negligence akin to intentional wrongdoing or reckless indifference to the rights of others.[2]

██ The contract describes ATPCO as the "agent" of Alitalia for the purpose of publishing airfares (Contract ¶ 2) and it is not disputed that ATPCO acted as Alitalia's agent in that regard. Alitalia argues that this creates a set of duties distinct from the contract. But the terms of an agency relationship may be defined and limited by contract. *Greenwood v. Koven*, 880 F.Supp. 186, 194 (S.D.N.Y.1995). As noted in Comment b to Restatement (Third) of Agency, § 8.08, Comment b. (2006) "A contract may also, in appropriate circumstances, raise or lower the standard of performance to be expected of an agent or specify the remedies or mechanisms of dispute resolution available to the principal." Here, with regard to incorporating Alitalia's airfare data into ATPCO's database, the contract specified that Alitalia could not recover consequential damages as the result of a mistake made by ATPCO. Thus, the contract that purportedly created the agency relationship also limited the remedies available to Alitalia when APTCO negligently made a mistake, notwithstanding any contrary standards of care imposed by agency law.

██ Finally, plaintiff argues that because the contract established an agency relationship, it may pursue a claim for breach of fiduciary duty. Where a fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract. *Med. Research Assoc., P.C. v. Medcon Fin. Servs., Inc.*, 253 F.Supp.2d 643, 649–50 (S.D.N.Y.2003) (dismissing breach of fiduciary duty claim as duplicative of breach of contract claim); *Brooks v. Key Trust Co. Nat'l Ass'n*, 26 A.D.3d 628, 630, 809 N.Y.S.2d 270 (3d Dep't 2006) (claim for

---

**2.** Plaintiff's evidence includes, among other things, ATPCO's inaction in the face of its prior knowledge of a high potential for coding errors based upon similar errors that occurred in the past (Exhs. AZ30, AZ31; Perkins Dep. at 12, 17–18, 28–29, 34–35, 39, 42–48.) its refusal to adopt a software fix that might have prevented the error (Perkins Dep. at 150–51; Dezelak Dep. at 64.) its reorganization which resulted in analysts processing codes for routes they were unfamiliar with (Bran Dep. At 33–35, 61.) its auditing analyst spending limited time auditing data (Lee Dep. at 8–9, 13.) and a failure to follow procedures. (Braun Dep. at 73–77, 182–183; Perkins Dep. at 86.).

breach of investment advisor's fiduciary duty "was properly dismissed" because the supporting allegations "are either expressly raised in plaintiff's breach of contact claim or encompassed within the contractual relationship."). Virginia follows the same rule. *Augusta Mut. Ins. Co. v. Mason,* 645 S.E.2d at 295.

## II. *Conclusion*

Alitalia's claims for negligence and gross negligence sound in contract and not in tort because ATPCO's duty to input data arose solely by reason of the contract. Its claim for breach of fiduciary duty is also governed by the contract. The limitation of liability provision in the contract between sophisticated commercial entities precludes, as a matter of Virginia law, recovery for the lost revenue and profits sought in this action. Alternatively, if New York law were to apply, no reasonable jury could conclude that ATPCO engaged in conduct akin to intentional wrongdoing or reckless indifference. ATPCO's motion for summary judgment is granted. The Clerk is directed to enter judgment accordingly.

SO ORDERED.