**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2759-22

IRFAN HASSAN and LITTLE
MASON PROPERTIES, LLC,

      Plaintiffs-Appellants,

v.

MARC-ROLAND THEOPHILE,
and EIGHT COPELAND ROAD
GROUP, LLC,

      Defendants,

and

U.S. BANK NATIONAL ASSOCIATION
as Trustee for VELOCITY
COMMERCIAL CAPITAL LOAN
TRUST 2018-2, U.S. BANK NATIONAL
ASSOCIATION as Trustee for
VELOCITY COMMERCIAL CAPITAL
LOAN TRUST 2018, NATIONSTAR
MORTGAGE, d/b/a MR. COOPER,
VELOCITY COMMERCIAL CAPITAL,
LLC and/or its ASSIGNEE US BANK
COMMERCIAL CAPITAL, LLC,
JEST HOLDINGS, LLC, EDDY JEAN
JACQUES, 1ST RATE TITLE AND
SETTLEMENT SERVICES, LLC,

EDWARD MCCLOUD, CLOSE NOW, LLC, ANTHONY BARBER, NAPIER PARK LH-NP-STRAT DELAWARE OSNER TRUST, WILMINGTON SAVINGS FUND SOCIETY, FSB d/b/a CHRISTIANA TRUST, not in its individual capacity, but solely in its capacity as CERTIFICATE TRUSTEE FOR NRP MORTGAGE TRUST I, REVOLVING MORTGAGE INVESTMENT TRUST 2017-BRQ1, by U.S. BANK NATIONAL ASSOCIATION as Trustee, CHICAGO TITLE INSURANCE COMPANY, and TITLE INSURANCE ISSUERS 2-5,

Defendants-Respondents.

_____

Argued October 22, 2025 – Decided February 11, 2026

Before Judges Currier and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Union County, Docket No. C-000005-20.

Richard T. Welch argued the cause for appellants (Starr, Gern, Davison & Rubin, PC, attorneys; Richard T. Welch and Ronald L. Davison, on the briefs).

Bethany A. Abele argued the cause for respondents Jest Holdings, LLC, Revolving Mortgage Investment Trust 2017-BRQ1, by U.S. Bank National Association, as trustee, U.S. Bank National Association as Trustee for Velocity Commercial Capital Loan Trust 2018 a/k/a U.S. Bank National Association as Trustee for Velocity Commercial Capital Loan Trust 2018-1, U.S. Bank

2

A-2759-22

National Association as Trustee for Velocity Commercial Capital Loan Trust 2018-2, Wilmington Savings Fund Society, FSB d/b/a Christiana Trust, as Certificate Trustee for NRP Mortgage Trust 1, LH-NP-Strat Delaware Owner Trust, U.S. Bank., as Indenture Trustee for VCC 2022MC-1 Trust and Velocity Commercial Capital, LLC (Riker Danzig LLP, Pincus Law Group, PLLC, Solomon Rubin, and Stern & Eisenberg, attorneys; Michael R. O'Donnell and Bethany A. Abele, of counsel and on the brief; Kori L. Pruett, Michael Clark, Solomon Rubin, and Salvatore Carollo, on the brief).

Richard Spatola argued the cause for respondents 1st Rate Title and Settlement Services, LLC and Edward McCloud (Calcagni & Kanefsky LLP, attorneys; Lauren M. Paxton, of counsel and on the brief; Richard Spatola, on the brief).

Jeffrey S. Quinn argued the cause for respondents Anthony Barber and Close Now, LLC (BBC Law, LLP, attorneys; Jeffrey S. Quinn, on the brief).

Anthony Twardowski (Zarwin, Baum, DeVito, Kaplan, Schaer & Toddy, PC) of the Pennsylvania bar, admitted pro hac vice, argued the cause for respondent Chicago Title Insurance Company (Zarwin, Baum, DeVito, Kaplan, Schaer & Toddy, PC, attorneys; Chelsea P. Jasnoff and Anthony Twardowski, on the brief).

PER CURIAM

In this matter, we review whether the business relationship between plaintiffs and defendant Marc-Roland Theophile permitted Theophile to act on behalf of plaintiffs and refinance properties owned by plaintiffs through

3

A-2759-22

Theophile's company, defendant Eight Copeland Road Group, LLC (ECRG). Theophile transferred eighteen of the properties to ECRG, which were used as collateral to refinance existing loans on plaintiffs' properties. Theophile stated that the proceeds were intended to satisfy plaintiff Irfan Hassan's debts and liens, as well as to fund future investments for both Hassan and Theophile. Hassan alleged Theophile had no authority to act on plaintiffs' behalf.

After a bench trial, Chancery Judge Robert J. Mega found Hassan had executed an operating agreement on behalf of plaintiff Little Mason Properties, LLC (LMP) which Theophile used to obtain the loans. The judge further found there was an agreement between Hassan and Theophile to refinance the mortgages, and that Theophile had the authority to transfer the properties from LMP to ECRG to obtain the loans.

We affirm the final judgment, with one modification, substantially for the reasons expressed in Judge Mega's comprehensive, well-reasoned written opinion. In the decision, Judge Mega found that plaintiffs were entitled to half of the proceeds generated from the loan agreements. We remand for the court to determine the specific amount of proceeds owed to Hassan from the loans procured by Theophile and issue an amended order for final judgment.

Plaintiffs also appeal from Judge Mega's orders granting defendant lenders[1] partial summary judgment and granting the title and mortgage company defendants[2] summary judgment. We affirm those orders.

I.

We derive the following facts from the eleven days of trial that took place in 2023.

Hassan testified he was in the business of developing commercial and residential real estate. He formed LMP in 2013 as a Delaware corporation.

Hassan testified that by June 2017 he owned approximately forty properties worth approximately $30 million, as well as a gasoline station. Around this time, he met Theophile who told him that he also was involved in real estate. According to Theophile, Hassan said he had "credit issues" and that there were liens on some of his properties. Theophile testified that Hassan told

---

[1]  Plaintiffs appeal from the orders granting partial summary judgment to defendant lenders Jest Holding, LLC (Jest) and Velocity Commercial Capital, LLC (Velocity). The remaining entities listed are successors to Velocity.

[2]  Plaintiffs appeal from the orders granting summary judgment to defendant title companies, Chicago Title Insurance Company and 1st Rate Title and Settlement Services, LLC, 1st Rate's owner Edward McCloud, and a mortgage broker, Close Now, LLC and its head, Anthony Barber, on plaintiffs' negligence and intentional tort claims.

A-2759-22

him about his financial issues because the New Jersey Department of Environmental Protection (DEP) had filed charges against him for selling regular gasoline as super grade so his name was "jammed up." Hassan confirmed DEP had sued him in 2017 to gain access to one of the LMP properties and also placed a $600,000 lien on the property for cleanup and removal costs. A second LMP property also had DEP liens against it.

Hassan conceded that prior to meeting Theophile, he had lost three of his properties by way of a tax sale foreclosure. Hassan also testified there were tax liens on some of his residential properties amounting to about $300,000. However, he denied that he was in "financial distress." Hassan later admitted that during a 2019 hearing to stay some of the foreclosures, he stated he had cash flow problems. Hassan also did not dispute that some of his properties were not "in top notch condition."

Hassan testified that at the time he met Theophile, twenty-six of his forty-one properties were the subject of tax lien certificates, including a residence in which he lived with his parents. Of the eighteen properties at issue in this litigation, seventeen had tax sale certificates levied upon them.

Theophile testified that Hassan asked him for help with his financial problems. In contrast, Hassan testified that Theophile offered to help him find

6

financing but the two never came to an agreement. According to Hassan, Theophile was "proposing . . . that he will borrow the money under his name because . . . he has good credit." Theophile would then "collateralize LMP" with the loan proceeds and "buy into the shares of LMP." With that funding, LMP would engage in "bigger projects." Hassan believed that Theophile "wanted to come in as a partner" without investing any of his own money.

According to Hassan, the two discussed a "financing proposal" where Theophile would secure loans on Hassan's properties under his own name and transfer the proceeds to Hassan. In exchange, Hassan would convey the properties to Theophile at a value representing eighty percent of the loan to value ratio. Hassan added that there was never a "formal agreement" but they "spoke about it." Hassan testified that initially the plan was for Theophile to have ECRG[3] take out loans on LMP properties with Theophile as guarantor. Whether Hassan would agree to the loans would depend on the interest rate and the loan to value ratio.

Hassan testified that he did not give Theophile the authority to enter into any transaction without his approval. Hassan denied he had an agreement with Theophile to transfer any interest in LMP to him as part of a financing proposal.

---

[3] Theophile formed ECRG in 2015. He was the sole member of the company.

A-2759-22

He also denied that he authorized Theophile to take out mortgages on, or transfer any, of the properties held by LMP.

According to Theophile, he and Hassan agreed that Theophile would refinance the properties, and they would then divide the proceeds. They agreed that ECRG would borrow the loans on the properties held by LMP. Theophile claimed that Hassan never told him to disclose that Hassan was the owner of LMP on any loan applications because "[Hassan] said that he has to stay on the background because his name is dirty." Theophile stated that he and Hassan were refinancing the properties so they could have the capital to invest in overseas ventures.

Theophile testified that Hassan authorized him to negotiate with lienholders and other creditors of Hassan and that Hassan was aware that he was doing so. Theophile claimed that the plan was for him to obtain the refinance funds, use them to clear up the liens, and then transfer the properties back to Hassan. Hassan and Theophile could then sell the properties. Theophile testified it was never expected that he would keep the properties, but rather he would return them to Hassan after the financing had been obtained. Theophile testified he would receive $2.5 million from the proceeds as a fee for his efforts.

A-2759-22

Richard Azikiwe, an attorney who represented Hassan on real estate matters, testified that Hassan told him in mid-2017 that Theophile was trying to obtain loans on the properties. Azikiwe told Hassan that he should go to an institutional lender if he wanted to "rais[e] that kind of financing" because relying on one individual such as Theophile was "highly questionable."

Hassan began receiving loan applications from Theophile in June 2017. Hassan claimed that in 2017 he did not know the difference between a refinance and a purchase. Theophile testified that Hassan never questioned the meaning of the term "refi."

In an e-mail dated June 16, 2017, Hassan told Theophile that Theophile would need to fill out the loan application for a property located at 1576 Maple Avenue in Hillside. Theophile sent Hassan an email on June 23, asking him to fill in credit card information on the loan application for the Maple Avenue property. Hassan gave Theophile one of his credit cards to pay for the loan application. Theophile testified that Hassan did not question why the application stated that ECRG would be the borrower. Theophile signed a letter of intent on the same date, which he sent to Hassan. Two days later, Theophile sent Hassan another letter of intent regarding a different property.

9

According to Theophile, on June 28, 2017, Hassan sent Theophile a blank copy of an LMP operating agreement. Prior to that time, LMP had not operated under a formal operating agreement. Hassan asked Theophile to fill in the form and leave it at his gas station. Theophile did so and then later picked up a completed signed version of the agreement at the station. According to Theophile, at that time, Hassan left him items such as cash, blank checks, as well as the operating agreement at the gas station for Theophile to pick up. After collecting the agreement, Theophile took it to a notary.

The operating agreement was dated December 4, 2013, the day after LMP was formed, and was signed by both Theophile and Hassan and notarized with that date. The notary, Eddy Jean Jacques, testified that he had put that date on the agreement by mistake, but later stated that Theophile told him to use the December 4, 2013 date. Theophile claimed that Hassan suggested that the date LMP was formed be put on the line next to the notarization. The agreement stated that Theophile had 99% of the voting interests and Hassan had 1%. Theophile listed himself as LMP's registered agent and used ECRG's address for LMP.

Theophile registered LMP as a New Jersey corporation the following day, on June 29, 2017, using Hassan's credit card to pay the fee. Theophile testified

10

that he was on the phone with Hassan while he was doing the online registration, and that he did so with Hassan's approval and consent.

In a subsequent foreclosure hearing, Hassan testified that Theophile had told him that he would "take care" of registering LMP as a New Jersey corporation. However, Hassan testified at trial in this matter both that he could not recall whether he had authorized Theophile to do so and that he did not give such authorization. Theophile claimed that Hassan knew what Theophile was doing, and Theophile believed he had Hassan's authorization to act on behalf of LMP.

Hassan admitted sending Theophile a sample LMP operating agreement on June 28, 2017. However, he did not recall receiving an email the following day from Theophile, forwarding a letter Theophile had written to a lender stating that he preferred to transfer the property to ECRG because ECRG was established and registered in New Jersey and LMP was not.

According to Theophile, he sent Hassan a spreadsheet with a cover letter on July 10, 2017, stating the purpose of seeking the loans was to refinance existing debt equity of forty-three properties, including the properties at issue here. Theophile said Hassan was only concerned about the loan to value percentage. That same day, Theophile sent Hassan a proposal for an $8.14

11

million loan to refinance "existing debt/equity" on forty-three properties held by ECRG. On July 17, Theophile sent Hassan a proposal for an $800,000 loan for the Maple Avenue property. The listed borrower was LMP and Theophile was the guarantor. Hassan said he "didn't even look at all of those details."

Hassan sent Theophile an email on July 21, 2017, stating he was "very disturbed to find out [Theophile] [was] trying to get [a] personal loan to take care of [Theophile's] IRS lien using [Hassan's] properties as collateral." He also alleged that Theophile had added his name as an agent of LMP and used Hassan's credit card to register LMP as a New Jersey corporation without his consent. Hassan asked Theophile to acknowledge that he had nothing to do with LMP. Hassan further stated in the email:

> A[s] we agreed and please confirm [y]ou are planning to get cash out loan under your name on my real estate and use the equity to become partner with me where I will be 51% [shareholder] and you will be 49% [shareholder]. If you get 60% loan to value ratio[,] I will give you back from the loan 11% to bring your share to 49%. . . . . Please confirm you will not use any of my properties anywhere for [a] loan without my written approval by email or text message.

Theophile acknowledged receipt of the email.

A few minutes later, Hassan sent Theophile another email stating:

> Please move one step at a time . . . lets do one loan at a time.

I'm thinking we should do as follow[s:]

First you[] clear your credit.

Second [w]e do building loan so we can get good 800k in hand.

Third we use building funding to fund big package and pay 51k for loan for 40 properties.

Fourth we do development approvals for all 7 projects and [sic] sent you today using funding we get from 40 residential package.

Theophile acknowledged receipt of the email and added that he agreed.

Shortly thereafter, Hassan sent another email to Theophile stating:

I am sorry brother I got really upset seeing my own house as loan collateral. I live here with my parents and wife and it was my parents['] house. I . . . trust you and think of you as [a] brother but I got to protect my house and my family interest.

Hassan and Theophile continued to work together after that time. Hassan did not take any action to revoke LMP's New Jersey registration.

Hassan testified that he did not agree to any of the proposed loans because the interest rates were too high. He stated that he communicated his rejection of the proposed loans to Theophile and told Theophile not to look for any more appraisals. Shortly thereafter, Theophile found another lender and offered to pay for the appraisals himself.

13

Hassan testified he attempted to get loans on his own through a mortgage broker, Brad Spingarn, without informing Theophile. In contrast, Theophile claimed that he introduced Hassan to Spingarn. In October 2017, Spingarn told Hassan that the judgment liens on the properties could be paid off out of the loan proceeds. Spingarn was able to obtain thirty-two conditional loan approvals by December 2017. The maximum loan to value ratio was 75%, the rest were 60%. Hassan stated that he paid $41,000 for the appraisals but said that in his view the appraisals were too low.

Theophile subsequently contacted Spingarn about "different scenarios" for financing. Before Theophile contacted him, Spingarn did not know that Hassan and Theophile were working together. Spingarn asked Hassan why he had not told him this "from the start," and Hassan acknowledged they had been working together. Eventually, while working with Theophile, Spingarn obtained approval from the lender Velocity for seventeen of the loans that had previously been conditionally approved. The remaining approval was from Jest. Theophile testified that Hassan knew about the loans from Velocity and did not question them.

According to Theophile, because it was difficult to secure the refinancing, he asked Hassan in January 2018 to give him a vehicle in consideration for his

14

efforts and because he needed a vehicle. This was in addition to his $2.5 million fee.

In a telephone message left for Theophile on February 23, 2018, Hassan stated that Theophile would be "a partner for everything we do." That same month, Hassan gave Theophile $5,000 to pay off his credit card debt to improve Theophile's credit so that he could get a better loan to value figure.

Between March and July 2018, Theophile secured mortgage loans on each of the eighteen properties at issue. The loan proceeds were used to pay off tax sale certificates and other liens on many of the properties Hassan still owned. In April 2018, Theophile sent Hassan an email with attachments regarding loans he had obtained from Velocity. Hassan did not respond and so did not question the loans or what Theophile was doing. Theophile said they had agreed that ECRG would be the mortgagor on the loans and that he told Hassan that he did not want to own the properties.

In order to effectuate the loans, Theophile transferred the properties from LMP to ECRG by executing deeds for the eighteen properties at issue which transferred title from LMP to ECRG. He, in turn, executed mortgages on the properties in return for the loans. Theophile signed a guaranty for each loan. He stated that Hassan was aware of and agreed to this arrangement.

15

Edward McCloud, the owner of the title company 1st Rate, testified that he did business with Theophile and saw LMP's name during the title process. 1st Rate participated in the closings on the loans to ECRG as settlement agent and provided title insurance to the lenders. McCloud had conversations with Theophile and Spingarn to establish that Theophile had the authority to enter into the transactions. McCloud stated that without the operating agreement, he would have been unable to determine Theophile's authority. McCloud testified that Theophile told him that he and Hassan were partners. McCloud stated that he had one conversation with Hassan in which Hassan sought information about the closings. Theophile testified that he told McCloud and Spingarn that he was working with Hassan.

In a text message on April 3, 2018, Hassan told Theophile not to close on a property without him being present.

Hassan claimed that Theophile used the appraisals to obtain the properties without informing him. Hassan stated that he did not learn of Theophile's actions until late June 2018 when he found out that eighteen of his properties were now listed under ECRG's name.

Roman Drukarov, who represented Hassan in 2017 on the sale and lease of some of Hassan's properties, examined the tax records of the Hillside property

A-2759-22

in June 2018; he told Hassan that LMP was not listed as the owner of the property, and Hassan told him that ECRG was the owner. In July 2018, Hassan asked Azikiwe to find out whether any of his properties had been transferred from LMP to another entity. Azikiwe checked and told Hassan that eighteen of his properties had been transferred. Hassan then began "hyperventilating" according to Azikiw.

Azikiwe met with Theophile to find out whether he had the authority to make the transfers. Theophile showed him the operating agreement. Azikiwe testified that Theophile answered no when he asked him whether Hassan had agreed to the operating agreement. Hassan then contacted the Union County Prosecutor's Office because he believed Theophile had committed loan fraud.

The total amount of the loans procured in 2018 was $3.4 million and nearly $700,000 of the proceeds were used to pay off various liens on the properties. ECRG was the borrower and mortgagor in each of the transactions—twenty-one loans on the eighteen properties. Hassan claimed that the properties were independently appraised at the time as being worth $5.1 million. Jest issued the Hillside property loan while Velocity issued the loans to the other seventeen properties.

A-2759-22

Theophile subsequently defaulted on the loans on the eighteen properties and the mortgage holders filed foreclosure actions on the properties in 2019, 2020, and 2021. Three of the properties were lost due to tax sale foreclosures in 2017, 2018 and 2019. One of the properties was sold at a sheriff's sale in August 2019 pursuant to a judgment of foreclosure.

In a March 31, 2023 written opinion, Judge Mega found Hassan was not a credible witness, stating "repeated contradictions, frequent evasiveness, and often unsupported assertions throughout [Hassan's] testimony clearly demonstrates his lack of credibility . . . ." The judge noted Hassan claimed that he never read correspondence with Theophile and others containing facts that were harmful to his position but did not make the same assertion when discussing correspondence that supported his position. In another example, the judge described that Hassan asserted he previously had no knowledge of what the term "refi" or "refinance" meant in the context of this matter, despite those words appearing frequently in texts and emails he exchanged with other parties throughout the course of these transactions without demonstrating any confusion.

Judge Mega also found that, on cross-examination, Hassan repeatedly was "unable to recall facts about which he had just testified while being examined

by his own attorney" and "continuously tried to provide evasive answers to simple questions about the contents of documents being directly shown to him." In addition, the judge found that "a large portion" of Hassan's testimony was contradicted by his own testimony and by the testimony of "other credible witnesses."

The judge found that Hassan's contention that there was no agreement to transfer any interest in LMP to Theophile was directly contradicted by Hassan's July 21, 2017, email to Theophile detailing his understanding that Theophile was to become a shareholder of LMP and receive additional compensation should he obtain a loan with a loan-to-value ratio of at least 60%. The judge also found that Hassan's claim that LMP was not in financial distress was inconsistent with the evidence that at least six of his properties were lost in tax foreclosure proceedings in the years prior to the parties' working together.

As to Theophile, the judge found his testimony was, overall, "consistent and reasonable" despite some inconsistencies. Judge Mega stated Theophile's testimony was "mostly credible and corroborated by subsequent witness testimony as well as admitted evidence."

19

A-2759-22

The judge found Spingarn, Azikiwe, McCloud, and Drukarov were credible witnesses. In contrast, the judge found the notary's testimony lacked credibility and he disregarded all of it.

In his findings of fact, Judge Mega found that in mid-2017, Hassan and Theophile came to an agreement to form a business alliance under which Theophile was to obtain loans using LMP properties as collateral. At the time, LMP did not have a valid operating agreement. The judge found that "Theophile was made an equitable, equal member of [LMP] based on actions of Theophile and Hassan . . . to the extent that Theophile was [able] to collateralize" the properties held by LMP. In addition, the judge found that Theophile had "the requisite authority to act on behalf of [LMP] and otherwise enter into agreements" approved by him and Hassan as to the eighteen properties at issue in the case. Judge Mega stated:

> Based on the testimony provided by the various witnesses and documents entered into evidence, . . . [t]his [c]ourt . . . finds that Theophile was acting with Hassan's knowledge and approval when seeking loan proposals, when registering [LMP] as an LLC in New Jersey, when transferring title to the subject properties from [LMP] to [ECRG], and when entering into the contested loan agreements.

The judge dismissed Hassan's action to quiet title because neither Hassan nor LMP were in possession of any of the properties at issue. The judge stated

A-2759-22

that an action to quiet title is "not intended to effectuate the evaluation of two competing claims of ownership," which was the real issue in dispute.

The judge also dismissed Hassan's ejectment claim, finding that Hassan "knew and otherwise authorized the transfer of title for the subject properties." The judge stated:

> The [c]ourt finds that the subject deeds were executed with the active cooperation and consent of both Hassan and Theophile. Regardless of whether Theophile actually was a member of [LMP], Hassan's knowledge and approval would, nonetheless, have been sufficient to properly transfer title to the properties in question. Thus, the [c]ourt concludes that the 18 deeds at issue . . . are valid and that title to the subject properties is properly held by [ECRG].

In addressing the fraud count, Judge Mega found that Hassan had not established that Theophile had made any material misrepresentation of fact. The claim for tortious interference was similarly dismissed as the judge found Hassan did not prove that Theophile had improperly interfered with any of Hassan's protected interests since Theophile was acting with Hassan's knowledge and approval when he sought loan proposals.

For similar reasons, the judge rejected Hassan's conspiracy claim because Theophile acted with Hassan's knowledge and approval. The judge dismissed Hassan's negligence claim as to all defendants because Hassan did not set forth

21

evidence establishing any duty of care, including by expert testimony, or the other requisite elements to establish negligence by the lender or title defendants. Finally, the judge concluded that Hassan failed to show that any of the lender defendants negligently made any incorrect statement upon which he justifiably relied. Therefore, that count was dismissed.

The judge concluded:

> Hassan and . . . Theophile were acting in accordance with a common plan and agreement when entering into the 18 loans and mortgages at issue in this case. [The] [c]ourt further finds that Theophile was acting with Hassan's knowledge and approval when seeking loan proposals, when registering [LMP] as an LLC in New Jersey, when transferring title to the subject properties from [LMP] to [ECRG], and when entering into the 18 loan agreements. As a result, the [c]ourt finds that . . . title to the 18 properties at issue in this case are properly held by [ECRG], pursuant to the valid deeds executed by Theophile, with Hassan's knowledge and consent pursuant to their general business agreement.

Judge Mega stated that both Hassan and Theophile were "equally entitled to receive 50% of the proceeds generated from the loan agreements that Theophile and [ECRG] entered into on behalf of the business arrangement."

## II.

On appeal, plaintiffs contend the court erred in: (1) concluding Hassan and Theophile agreed to the transfer of properties from LMP to ECRG and, thus,

22

entering judgment in favor of Theophile, and (2) granting summary judgment to the lender and title company defendants.

In reviewing a decision following a bench trial, we will "not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011) (quoting In re Tr. Created by Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008)). We will only intervene when the trial court's conclusions are clearly mistaken or wide of the mark. Gnall v. Gnall, 222 N.J. 414, 428 (2015). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

Plaintiffs challenge Judge Mega's conclusion primarily by pointing to evidence in the record that contradicts or questions the judge's factual determinations. However, as we are reviewing this case after trial, we proceed on the premise that it was within the trial judge's purview to make conclusions based on conflicting facts; it is not for this court to "weigh the evidence . . . or make conclusions about the evidence." Mountain Hill, L.L.C. v. Twp. of

Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)).

In addition, Judge Mega made detailed credibility findings regarding each witness. "Since matters of credibility are within the domain of the fact finder rather than [the] reviewing court, we may not fairly interfere with such determinations made by a trial judge in evaluating the weight of the evidence in a bench trial." Rieder Cmtys., Inc. v. Twp. of N. Brunswick, 227 N.J. Super. 214, 224 (App. Div. 1988).

## A.

We begin with plaintiffs' contention that the judge's conclusion was against the weight of the evidence. We initially note that after observing and listening to Hassan over multiple trial days, Judge Mega found Hassan was not a credible witness for the reasons set forth above.

Plaintiffs assert that although there was "no dispute that Hassan and Theophile agreed to work cooperatively to try to find favorable financing, and that they contemplated doing so in a manner that might bring them into business together[,] [t]hat[] however, is a far cry from actually creating a joint venture." However, whether the parties formally created a joint venture is irrelevant. That they "agreed to work cooperatively to try to find favorable financing" is

24

sufficient. Hassan testified that the plan was for ECRG to take out loans on the LMP properties with Theophile as guarantor of the loans. This is what eventually took place.

In addition, Theophile's testimony was not the sole evidence establishing the parties' agreement. Spingarn, McCloud, and Drukarov testified as to their understanding that Hassan and Theophile were partners. In addition, Hassan's actions contradicted his own assertions. He continued to work with Theophile even after Hassan discovered that Theophile had filed documents indicating that Theophile was LMP's owner and agent, and that he was holding himself out as having the authority to act on behalf of LMP. When presented with a loan application for the property in Hillside, Hassan did not question why the application stated that ECRG, rather than LMP, would be the borrower. Hassan did not respond in any manner when Theophile sent him a document in April 2018 regarding the loans he had obtained from Velocity.

Further, Hassan's testimony that he allowed the tax sale certificates to go unpaid as merely a "business decision" was contradicted by the loss of several of the properties in tax foreclosure proceedings. Hassan testified that he learned of LMP's transfer to ECRG when Drukarov informed him that one of his properties was in the name of ECRG. However, Drukarov testified that he

25

learned of the transfer prior to that time from Hassan's own text messages. Again, the judge found Drukarov more credible than Hassan.

In addition, several times during his testimony, Hassan could not recall whether he received or read emails that were not helpful to his case, but he consistently had a good recollection when asked about emails that helped his position. Hassan also testified that he did not know what the terms "refi" and "cash-out" meant even though he had used those terms in emails and text messages to Theophile.

Plaintiffs further claim that Theophile forged the operating agreement he used to establish his ownership in seeking the loans. However, the record substantiates that Hassan sent Theophile a copy of an operating agreement for LMP and signed the agreement. Thus, the court's conclusion that Theophile was given the authority to transfer title to the properties from LMP to ECRG for purposes of obtaining the refinancing loans was supported by substantial credible evidence.

Hassan questions the court's conclusions regarding his financial condition at the time he entered discussions with Theophile. However, Hassan admitted that he had cash flow problems and that some of his properties were not in "top notch condition." Moreover, at the time Hassan met Theophile, he had lost three

of his properties to tax sale foreclosures, seventeen of the eighteen properties at issue had tax liens, and Hassan was involved in an ongoing dispute with DEP. Therefore, the court's conclusion on this point was supported by substantial credible evidence.

Given the judge's negative credibility determination as to Hassan, in conjunction with the supporting evidence, we are satisfied plaintiffs have failed to establish that the judge's determination that Hassan and Theophile entered into an agreement to have Theophile refinance properties owned by Hassan was against the weight of the evidence.

B.

We turn next to the orders granting summary judgment to defendant lenders and title companies. Plaintiffs contend the court erred in granting summary judgment to 1st Rate and McCloud on their negligence claims because there were issues of material fact as to whether those defendants owed plaintiffs a duty of care when issuing title policies to the lenders. Plaintiffs also contend the court erred in granting summary judgment to 1st Rate and McCloud on their intentional tort claims.

1st Rate and McCloud served as title and settlement agents for their lender clients. They performed the title examination necessary to issue a title insurance

policy in conjunction with the loans. 1st Rate was a policy issuing agent of Chicago Title. 1st Rate issued title insurance policies and encumbered the properties with mortgages. Chicago Title insured the mortgages by underwriting the title insurance for the mortgagees.

Theophile told McCloud that the transfers from LMP to ECRG were necessary to secure the loans. Theophile provided 1st Rate with information and documents needed to establish title to the properties. McCloud was given the operating agreement which listed Hassan and LMP as parties to the agreement, and a copy of LMP's Delaware certificate of formation.

In granting summary judgment to 1st Rate and McCloud, Judge Mega stated:

> [A] title agent cannot be liable to a non-insured. The title agent is only at the closing and places the policy for the purchaser. If he conducts the closing incorrectly, it does not give a third-party a right to bring a suit. Plaintiffs have not presented sufficient evidence that [1st Rate and McCloud] knew there was a problem with . . . Theophile's authority to act nor can there be any reliance by . . . Hassan on statements made by these [d]efendants. Intentional torts require steps that the evidence against these [d]efendants does not support. The [c]ourt finds that . . . McCloud took the steps he believed were reasonable and he complied with the applicable standard of care.

28

A court should grant summary judgment if the evidence shows there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. R. 4:46-2(c). The motion court must examine the facts in the light most favorable to the non-moving party. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016). We review the grant under the same standard. Ibid. The party opposing a summary judgment motion must do more than point to any fact in dispute; rather, it must demonstrate the fact is of a material or substantial nature. Id. at 479-80.

Plaintiffs have failed to establish that 1st Rate and McCloud owed them a duty in issuing a title policy to the lenders. The title policies were issued only to Velocity and Jest, the mortgagees of the properties in question. See Smith v. Boyd, 272 N.J. Super. 186, 196-97 (Law Div. 1993) (title company did not owe a duty to purchaser of property at foreclosure sale merely by preparing a title report for the foreclosing mortgagee).

In addition, plaintiffs did not present evidence that 1st Rate and McCloud knew Hassan had not given Theophile the authority to conduct the transactions. There is nothing in the record to indicate that these defendants had reason to question Theophile's authority or that the operating agreement was the result of fraud. Therefore, plaintiffs failed to establish that 1st Rate and McCloud owed

29

them a duty to determine whether Theophile's authority to enter into the transactions, specifically the operating agreement, was legitimate. Plaintiffs also failed to demonstrate that McCloud had knowledge of Theophile's alleged fraud and was complicit in same to establish intentional tort liability.

Because the transfers of property and issuance of mortgages were authorized, plaintiffs do not have a right to relief against these title agents. Therefore, Judge Mega properly granted summary judgment to 1st Rate and McCloud.

C.

In light of the above, we need only briefly address plaintiffs' contentions regarding the grant of summary judgment to Chicago Title. Plaintiffs' claims against Chicago Title are premised on 1st Rate's negligence. Since 1st Rate was not negligent, Judge Mega properly granted summary judgment to Chicago Title. In addition, as we have determined the transfer of the properties and procurement of the mortgages was authorized, plaintiffs have no right to relief against Chicago Title.

D.

Plaintiffs also assert the court erred in granting Jest's motion for summary judgment in their right of possession action. They maintain the lender does not

30

have to be in physical possession of the properties for plaintiffs to recover under the right of possession statute, N.J.S.A. 2A:35-1 to -3.

Judge Mega granted Jest Holdings' motion for partial summary judgment because the right of ejectment under the statute belongs to those who are in "physical possession" of the property. The judge stated: "N.J.S.A. 2A:35-2 requires that a defendant have been in possession of property as a prerequisite to recovery. The filing of a foreclosure action does not amount to possession of a property."

In an action under the right of possession statute,

> the plaintiff shall be entitled to recover from the defendant any and all incidental damages, including mesne profits, and the full value of the use and occupation of the premises for the time, not exceeding 6 years, before the commencement of the action, during which the defendant was in possession thereof.
>
> [N.J.S.A. 2A:35-2.]

The statute replaced the common law action of ejectment. Marder v. Realty Const. Co., 84 N.J. Super. 313, 320 (App. Div.), aff'd, 43 N.J. 508 (1964).

In this instance, none of the lenders, including Jest, were ever in physical possession of the property. Plaintiffs nonetheless claim that because the statute does not refer to physical possession, but only to "possession," they should have been able to recover damages under the statute. However, "[p]ossession of land

31

means the actual control by physical occupation."  State by State Highway Comm'r v. Hankins, 59 N.J. Super. 27, 31 (Law Div.), rev'd in part on other grounds, 63 N.J. Super. 326 (App. Div. 1960).  Similarly, adverse possession requires "possession of the land [that] is clear and unequivocal and to such an extent as to be immediately visible."  Mannillo v. Gorski, 54 N.J. 378, 388 (1969).  Thus, the possession must be "public and based on physical facts."  Id. at 387 (quoting 4 Tiffany, Real Property (rev. 3d ed. Supp. 1969 at 291)).  Therefore, since Jest never had physical possession of the land, plaintiffs cannot recover against the lender under the statute.

## E.

Plaintiffs also challenge the grant of summary judgment to defendants Barber and Close Now on their intentional torts claim.  They assert there were disputed issues of material facts as to whether Barber and Close Now, as mortgage brokers, knew there were conflicting claims regarding ownership of the properties.  Specifically, they claim that Spingarn, Close Now's agent, was aware that Hassan owned the properties.

In granting summary judgment to Barber and Close Now, Judge Mega found there was no evidence to support plaintiffs' claims against these commercial mortgage brokers.  In addition, the judge held that Barber could not

32

be held personally liable, as he "ha[d] no personal liability in light of the provisions contained in New Jersey's Revised Limited Liability Company Act."

During trial, Hassan stated that he spoke to Spingarn in mid-2017 but was unaware that he worked for Close Now. He met twice with Spingarn and understood that Spingarn was a mortgage broker and that mortgage brokers are not lenders. Hassan acknowledged that a mortgage broker does not approve loans.

Hassan did not know that Barber was Close Now's president in 2017 or have any communication with him. Hassan did not learn of Close Now's involvement in the transactions until late 2018. He could not point to any specific wrongdoing on Barber's part. He also could not offer any facts to support his claim that Close Now engaged in any fraudulent conduct regarding the disputed transactions.

The court did not err in granting summary judgment to Barber and Close Now because plaintiffs failed to offer any proof as to the claims alleged against them.

A-2759-22

F.

Lastly, plaintiffs contend the court erred by failing to include in the final judgment the precise amount of money they are entitled to as their 50% share of the proceeds from the loans.

In its written decision, the court determined that plaintiffs were entitled to half "of the proceeds generated from the loan agreements that Theophile and [ECRG] entered into on behalf of the business arrangement."  However, the court did not include a monetary figure in the final judgment.  As he did not participate in the appeal, Theophile did not oppose this request.

We agree there should be a determination as to the amount of monies plaintiff is entitled to from its 50% share of the loan proceeds.  Therefore, we remand to the trial court solely for entry of an amended final judgment to reflect the precise amount to which plaintiffs are entitled.

To the extent we have not commented on them specifically, all other points plaintiffs raise on appeal lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

Affirmed.  We remand solely for the entry of an amended order of final judgment in accordance with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2759-22